**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RASHAN MICKENS,** | : | |
| **Plaintiff** | : | **No. 1:24-cv-00190** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **SHARON CLARK, <u>et al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Currently before the Court is Defendants' motion to dismiss pro se Plaintiff's complaint.

The Court has also screened the complaint under 28 U.S.C. § 1915(e)(2)(B).  For the reasons

stated below, the Court will grant the motion to dismiss and dismiss the complaint.

**I.      BACKGROUND**

Pro se Plaintiff Rashan Mickens ("Mickens"), a convicted and sentenced state prisoner,

commenced this action by filing a complaint, an application for leave to proceed <u>in forma</u>

<u>pauperis</u> ("IFP Application"), and certified prisoner trust fund account statement, all of which the

Clerk of Court docketed on February 1, 2024.  (Doc. Nos. 1–3.)  In the complaint, Mickens

names as Defendants: (1) Sharon Clark ("Clark"), a Unit Manager at Pennsylvania State

Correctional Institution Rockview ("SCI Rockview"); (2) Heather Haldeman ("Haldeman"), a

Major of Unit Management at SCI Rockview; (3) A.J. Taylor ("Taylor"), a Sergeant at SCI

Rockview; and (4) R.G. Pollock, a Correctional Officer at SCI Rockview.  (Doc. No. 1 at 1–3.)

Mickens indicates that his claims against Defendants pertain to actions that allegedly

occurred at SCI Rockview from May 17, 2023 through August 15, 2023.[1]  (<u>Id.</u> at 4.)  Mickens

avers that on an unidentified date prior to May 11, 2023, he observed "CB Unit officers fail to

---

[1]  This date range does not appear to accurately cover the entirety of his factual allegations.

respond to an inmate's medical emergency on CB Unit, then act with indifference to his medical emergency once officers responded." See (id. at 5.)  It appears that Pollock and Taylor were among the officers involved with this medical emergency.  (Id. at 10.)  After observing this conduct by the officers, Mickens contacted the Pennsylvania Prison Society ("PPS") to report what he observed.[2]  (Id. at 5.)

On May 11, 2023, Mickens was out of his cell "during [his] cohort's scheduled time to have access to the phones and kiosks," when he overheard Pollock and another correctional officer use homophobic remarks as well as the n-word. See (id. at 5, 9).[3]  Mickens inquired of the officers as to whom they were speaking and, in response, they ordered him to return to his cell.  (Id. at 9.)  Mickens complied with this order and, later that day, he filed a grievance about this incident in which he sought the removal of Pollock and the other correctional officer from the CB Unit or reprimands "for their insensitivity towards gays and African Americans."  See (id. at 5, 9; Doc. No. 1-1 at 2).

This grievance was rejected on May 16, 2023, because it did not comply with the Commonwealth of Pennsylvania Department of Corrections ("DOC") Inmate Grievance System (DC-ADM 804).  (Id. at 3.)  Mickens was informed that "allegations of a sexual nature (abuse/harassment) against a staff member . . . must be investigated to make sure that the inmates

---

[2]  The PPS has been described "as an organization dedicated to advocating for prisoners, visiting prisoners, writing to prisoners, and listening to prisoners."  See Abney v. Younker, No. 13-cv-01418, 2018 WL 398323, at *11 (M.D. Pa. Jan. 12, 2018).

[3]  Although the Court states that this alleged event occurred on May 11, 2023, Mickens does not identify the date in the body of his complaint.  The Court obtained the date by reviewing Mickens's grievance attached to his complaint.  This is one of many instances in his complaint where Mickens fails to plead the date of an alleged event.  Mickens is advised that attaching the grievances or other documents to his complaint is not a substitute for factual allegations.  It is incumbent upon him, even while proceeding pro se, to include sufficiently specific allegations in his complaint.

2

are safe in th[e] facility." See (id.).  As such, the grievance was forwarded to SCI Rockview's security office and the Prison Rape Elimination Act ("PREA") Compliance Manager for purposes of an investigation.  See (id.); see also (Doc. No. 1 at 9 (allegation that "[t]he grievance was properly rejected and forwarded to the Facility Security Office and the [PREA] Compliance Manager for initiation of an investigation")).

A few days later, Mickens was called to the shift commander's office, where he was asked to withdraw his complaint.  (Id. at 5, 9.)  Mickens refused.  (Id.)  At no point thereafter was Mickens informed of any investigation into his complaint, and Pollock and the other correctional officer "are still in their assigned duties."  See (id.)  Defendants also began retaliating against Mickens.  (Id. at 9.)

Mickens alleges that Pollock began to constantly harass and act "extremely unprofessional" toward him.  See (id. at 5, 9.  On May 17, 2023, Mickens was "using the toilet and had a 'curtain' partially obstructing the view of [him] on the toilet as is traditionally done by all inmates without consequence, although not in line with the rules."  See (id. at 5).  Mickens points out that "[o]fficers usually only complain about a curtain when using the toilet if it fully obstructs their view to the cell and/or inmate."  See (id.).  Yet, when Pollock observed Mickens using the "curtain" to partially obstruct the view of his "lower extremities," Pollock yelled to Mickens, "Take down your fu**ing tent, dickhead!"  See (id. at 5, 9).

Mickens filed a grievance relating to this incident, and he believes that Pollock should have been disciplined for using foul language because it violated the DOC's Code of Ethics.  See (id. at 9).[4]  Clark was the Grievance Officer assigned to this grievance, and she rejected it as

---

[4]  Mickens alleges that he attached this grievance to the complaint (id. at 5); however, it is not attached.

frivolous.  (Id. at 5, 9–10; Doc. No. 1-2 at 6.)  Clark described her investigation into the

allegations in the grievance as well as her reasons for rejecting it as follows:

> Mr. Mickens, I have read your grievance, reviewed the 5/17/2023 SCI Rockview Control Packet, reviewed the PA DOC Inmate Handbook 2017 Edition, reviewed the SCI Rockview Inmate Handbook Supplement, and interviewed CO1 Pollock. To summarize your issue, you claim on 5/17/2023, Officer Pollock stopped at your cell and yelled "Take down your fu[**]ing tent, dickhead"[]and walked away.
>
> The findings of this investigation include the following: Upon review of the PA D[OC] 2017 Inmate Handbook Section VIII.C.7 – Unless approved, nothing is to be affixed to the bars, vents, windows, beds/bunks, walls, or cell doors[,] and the SCI Rockview 2022 Inmate Handbook Supplement Section VIII.A.14 – Nothing may be fastened to the cell door, bars, beds, vent, cabinets, lights or window other than the approved privacy panel. On 5/17/2023, SCI Rockview was locked down and CO1 Pollock worked the 6-2 shift on CB Unit. Officer Pollock reported that there were many times throughout his shift that he had to stop at your cell to tell you to take down the unauthorized item(s) you had affixed to your bed/bunk because he couldn't see you. He states that he told you to take down the tent during each of his housing unit rounds; but denies yelling and using any foul or vulgar language when speaking to you.
>
> The result of this investigation concludes that based on the above information, if you would have removed the unauthorized item(s) affixed to your bed/bunk the first-time [sic] staff told you about it, the issue would have been resolved. But, because you chose to not remove the unauthorized item from you [sic] bed/bunk, Officer Pollock had to continue to readdress this issue with you throughout his shift. You are fortunate that you were not issue [sic] a misconduct due to your refusal to obey an order the first time Officer Pollock addressed this issue with you. Officer Pollock's version of the events is viewed to be more credible than yours. Therefore, this grievance is denied.
>
> No relief was requested in this grievance.
>
> . . .
>
> This grievance has been found as being frivolous as your allegations lack any arguable basis in law, fact, and/or policy.

See (Doc. No. 1-2 at 2).[5]

---

[5]  Mickens appealed from this denial to final review with the DOC Secretary's Office of Inmate Grievances & Appeals ("SOIGA"), where the denial was upheld.  (Id. at 3–6); see also (Doc. No. 1 at 5).

Mickens criticizes Clark's denial of his grievance because she did not interview anyone other than Pollock. (Id. at 10.) Rather, she "simply took Pollock at his word . . . that he did not use foul and vulgar profanity directed at [him]." See (id.). Additionally, Mickens alleges that:

> Pollock admitted to interacting with me during the course of his shift concerning the "tent", [sic] or curtain [he] had used. Pollock, as a commissioned officer, had the authority to write a misconduct for the alleged infraction, but chose instead to use abusive language in a loud and boisterous manner because of Pollock's anger towards [him] in informing the PA Prison Society about his negligent involvement in an inmate's death from failing to respond to the inmate's medical emergency in a timely fashion.

See (id.).

On July 24, 2023, Mickens had an in-person contact visit with his family scheduled for 12:45 p.m. (Id. at 6, 10; Doc. No. 1-3 at 2.) Ordinarily, the facility "count" is at 12:30 p.m., so inmates are instructed to retrieve a pass from housing unit officers at 12:15 p.m. to report to the visitation room prior to the 12:30 count. (Doc. No. 1 at 6, 10.) Once the 12:30 p.m. count occurs, inmate walkways close and inmate movement ceases. (Id. at 6.)

Mickens approached the CB Unit to obtain his visit pass, but Taylor and Pollock ordered him to return to his cell because they were not "doing visits" yet. See (id.). Neither Taylor nor Pollock called Mickens over prior to the 12:30 p.m. count. (Id.) Once "count cleared" at approximately 1:00 p.m. and the inmate walkways opened, Mickens approached the CB Unit desk again. See (id.). Mickens was asked why he was out of his cell, and Mickens responded that he told them that he had a visit scheduled. (Id.) Taylor and Pollock responded to him that it was not their "job to worry about [his] visit." See (id.). Mickens was then given his pass to report to the visit room, but he was forty-five (45) minutes late even though his family drove for "hours" to see him. See (id.).

Once Mickens reported to the visit room, officers there asked him where he had been. (Id.)  Mickens described what occurred with Taylor and Pollock, and the officers informed him that they called CB Unit more than once to have Mickens sent for his visit prior to the 12:30 p.m. count.  (Id.)  Following his visit, Mickens spoke to two (2) other CB Unit inmates who also had 12:45 p.m. visits that day, and they told him that they did not have any issues retrieving their passes for their visits.  (Id.)  Mickens asserts that Pollock and Taylor retaliated against him by "intentionally thwarting [his] ability to attend his in-person contact visit" due to his report to the PPS about their failure to respond to the deceased inmate's medical needs.  See (id. at 10).

Three (3) days later, Mickens submitted a grievance about the issues he encountered getting a pass for his visit.  (Doc. No. 1-3 at 2–3.)  For relief, Mickens requested that Taylor and Pollock be removed from the unit and/or reprimanded, and he also requested $250,000 in monetary damages.  (Id. at 2.)

On August 21, 2023, Clark issued an Initial Review Response in which she rejected the grievance as frivolous.  (Id. at 4.)  She explained the reasons for the rejection as follows:

> Mr. Mickens, I have read your grievance, reviewed the Daily Roster for 6-2 shift for 7/25/2023, and interviewed CO1 R. Pollock and CO2 A. Taylor.  To summarize your issue, you claim Sgt. Taylor and CO Pollock did not give you your pass for a visit before count 7/24/2023 and that staff made you late for your visit; but, other inmates were sent.
>
> The findings of this investigation include the following: Upon review of the 7/24/2023 Daily Roster, Sgt. Taylor and CO Pollock worked the 6-2 shift on CB Unit.  Upon interviewing both staff separately, both informed me that the Visiting Schedule was posted on the housing unit on 7/24/2023.  Both also informed me that you did not come to the Officers' Desk prior to the start of Noon Count that day to get your pass.  However, you did come to the Officers' Desk after the Noon Count cleared and asked for your pass to go to your scheduled visit.  You were given your pass to go to your visit.  Both denied making any of the statements you claim they made in this grievance.
>
> The result of this investigation concludes that you were late for your visit because you did not come up to the Officers' Desk prior to the start of Noon Count to get

your pass.  When you came up to the Officer's Desk after the Noon Count cleared and asked for your pass to go to your visit, this tells me that you knew you had a visit scheduled.  Therefore, the Officers' version is viewed to be more credible than yours.  Therefore, this grievance is denied.

The request for relief sought to have Officer Pollock and Sgt. Taylor removed from the Housing Unit and/or reprimanded/disciplined and you be awarded monetary compensation not to exceed the statutory limit of $250,000 is denied.

. . .

The grievance has been found as being frivolous as your allegations lack any arguable basis in law, fact, and/or policy.

See (id.).[6]

Mickens complains that Clark again failed to conduct a sufficient investigation into his grievance.  (Doc. Nos. 1 at 6, 10; 1-3 at 5.)  In particular, he believes that Clark should have interviewed the visit room staff who told Mickens that they had contacted the CB Unit to have him sent for the visit prior to the 12:30 p.m. count.  (Doc. Nos. 1 at 6, 10; 1-3 at 5.)  He also criticizes Clark's decision to interview only Pollock and Taylor and accept their version about what happened.  (Doc. Nos. 1 at 6, 10; 1-3 at 5.)

On August 14, 2023, approximately a week prior to Clark issuing her Initial Review Response rejecting his July 27, 2023 grievance, Mickens was moved from CB Unit to CA Unit.  (Doc. No. 1 at 6, 10.)  Although Mickens was moved, his cellmate remained in CB Unit.  (Id.)  Clark is the Unit Manager of CA Unit.  (Id.)

Mickens views his move to CA Unit as an act of retaliation by Clark.  (Id. at 6, 10.)  He alleges that his view was confirmed when the "2-10pm unit officers" told him that his move was in retaliation for his grievances against Taylor and Pollock and his report to the PPS.  (Id. at 6,

---

[6]  Mickens also appealed from this denial to final review with SOIGA, where the denial was upheld.  (Id. at 5–8); see also (Doc. No. 1 at 6, 10).

11.)  On August 16, 2023, Mickens also spoke to Clark about the move, and she told him that she could do what she wants to do as a Unit Manager.  (Id.)

Mickens avers that following his move into the new cell, he entered into a cell agreement with another inmate, which was approved by the Block Sergeant for the CA Unit.  (Id. at 11; Doc. No. 1-4 at 3.)  However, Clark moved a different inmate into Mickens's cell and did not honor the cell agreement.  (Doc. Nos. 1 at 10–11; Doc. No. 1-4 at 3.)

As with the other incidents, Mickens filed a grievance on August 24, 2023, about his move to CA Unit and Clark's failure to honor his cell agreement.  (Id.; Doc. No. 1-4 at 2–3.)  He sought monetary compensation, a directive requiring Clark to honor his cell agreement, an order preventing him from being moved from "C Unit" in retaliation, and the issuance of a reprimand to Clark or the imposition of discipline against her.  (Doc. No. 1-4 at 3.)

Haldeman issued an Initial Review Response denying Mickens's grievance as frivolous on September 14, 2023.  (Id. at 4.)  Haldeman detailed his reasons for denying the grievance as follows:

> Mr. Mickens, I have read your grievance and interviewed Unit Manager Clark about this grievance.  To summarize your issue, you claim that UM Clark moved you from CB Unit to CA Unit in retaliation for grievances you filed against CB Unit Officers, as well as, direct communication with the PA Prison Society concerning the officers.  You claim you asked UM Clark on 8/16/2023 why she moved you.  You allege she replied: "I'm a Unit Manager, I can do what I want to do." As relief, Inmate Mickens request [sic] monetary compensation not to exceed the statutory limit of $250,000.00, UM Clark honor [sic] cell agreements, comply with policy, not move inmates off of C Unit in retaliation, and UM Clark to be reprimanded and/or disciplined.
>
> The findings of this investigation include the following: On 8/15/2023, you were moved from CB Unit to CA Unit due to safety/security reasons by UM Clark.  Upon interviewing UM Clark, she does not recall speaking with you on 8/16/2023, and denies making the statements you claim she said to you.  She also does not recall receiving a Voluntary Cell Agreement Form from you, and denies placing another inmate in the cell with you.  The results of this investigation conclude that cell assignment is based on staff evaluation.  Your preferences will be assessed by staff,

8

but not necessarily granted. Staff initiated cell changes for safety or security reasons may occur at any time with the Unit Manager or the Shift Commander, or their designees. There is no evidence in the above investigation to support your claim against UM Clark. This is a "he said she said" situation. I am unable to substantiate your claims that UM Clark violated any PA DOC Policies and/or PA DOC Code of Ethics. UM Clark's version is viewed to be more credible than your version. Based on the above information the grievance and requested reliefs are denied.

See (id.).[7]

Based on these allegations, Mickens appears to assert causes of action against Defendants under 42 U.S.C. § 1983 for: (1) "us[ing] foul and vulgar language towards [him]" on May 17, 2023; (2) "intentionally thwarting [his] attendance at in-person visitation" on July 24, 2023; (3) retaliating against him in violation of the First Amendment to the United States Constitution; and (4) conspiring to violate his civil rights. See (Doc. No. 1 at 4, 8, 12–15). Although it is somewhat unclear, Mickens appears to assert these causes of action against Defendants in their official and individual capacities. (Id. at 15.) For relief, Mickens seeks monetary compensation as well as "disciplinary action against Defendants, including but not limited to, removal from current positions/posts." See (id. at 8).

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Under Rule 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled

---

[7] Mickens appealed from this denial to final review with SOIGA, where the denial was upheld. (Id. at 5–9); see also (Doc. No. 1 at 7, 11).

to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  See id.  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).  Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the Third Circuit Court of Appeals has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).  When following these steps, "a court must

consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Higgs v. Att'y Gen., 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe [their] complaint liberally" (citation and internal quotation marks omitted)). Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting Estelle, 429 U.S. at 106). This means the Court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244–45 (3d Cir. 2013))). Moreover, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it." See Mala, 704 F.3d at 244. However, pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).

### B.    Review Under 28 U.S.C. § 1915(e)(2)(B)

Because the Court has granted Mickens leave to proceed in forma pauperis (Doc. No. 6), the Court "shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim upon which relief may be granted." See 28 U.S.C. § 1915(e)(2)(B)(ii) (emphasis added). In reviewing legal claims under Section 1915(e)(2)(B)(ii), the Court applies the

aforementioned standard governing Rule 12(b)(6) motions to dismiss.  See, e.g., Smithson v. Koons, No. 15-cv-01757, 2017 WL 3016165, at *3 (M.D. Pa. June 26, 2017) ("The legal standard for dismissing a complaint for failure to state a claim under . . . § 1915(e)(2)(B)(ii) . . . is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure."), report and recommendation adopted, 2017 WL 3008559 (M.D. Pa. July 14, 2017).

### C.    Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

III.    **DISCUSSION**

A.    **Screening Under Section 1915(e)(2)(B)**

1.    **Mickens's Request to Have Defendants Removed from Their Positions**

Among Mickens's two (2) demands for relief is a request that the Court direct that

Defendants be "remov[ed] from [their] current positions/posts."  See (Doc. No. 1 at 8).  The

Court has construed this demand as a request to have Defendants fired from their jobs with the

DOC.  This Court lacks the authority to impose injunctive relief in the nature of terminating a

defendant's employment.  See Buskirk v. Pa. Bd. of Prob. & Parole, No. 22-cv-01826, 2022 WL

4542094, at *1–2 n.4 (E.D. Pa. Sept. 28, 2022) (construing plaintiff's request for the court to

terminate the defendants' employment as seeking injunctive relief and holding that the court has

no authority to terminate the employment of a state employee); see also Dongarra v. Smith, No.

18-cv-01939, 2020 WL 4934660, at *5 (M.D. Pa. Aug. 24, 2020) (dismissing plaintiff's request

to terminate defendant's employment because plaintiff has not "named any defendant who has

the power to terminate [defendant] from his job"), aff'd, 27 F.4th 174 (3d Cir. 2022); Pagonis v.

Raines, No. 17-cv-00001, 2018 WL 9240919, at *4 (W.D. Tex. Aug. 10, 2018) (explaining that

federal courts are not "prison managers" and concluding that injunctive relief in the form of

terminating a prison official's employment is unavailable in a Section 1983 action (citing Shaw

v. Murphy, 532 U.S. 223, 230 (2001))), report and recommendation adopted, 2018 WL 9240916

(W.D. Tex. Sept. 10, 2018).  Therefore, the Court will dismiss Mickens's request to have

Defendants fired from their jobs for the failure to state a claim under Section 1915(e)(2)(B)(ii).

2.    **Mickens's Request for Imposition of Discipline Against Defendants**

As with his request that Defendants be terminated from their jobs, Mickens's request that

they receive "disciplinary action" also fails to state a cognizable claim for relief.  See, e g.,

Meeks v. DeBouse, No. 23-cv-00619, 2024 WL 1862187, at *4 (N.D. Tex. Apr. 29, 2024) (citing cases and explaining that "courts have determined that relief in the form of disciplining defendants is not cognizable"), aff'd, No. 24-10431, 2024 WL 4457846 (10th Cir. Oct. 10, 2024); Lopez v. Semple, No. 18-cv-01907, 2019 WL 109339, at *5 (D. Conn. Jan. 4, 2019) ("This Court cannot order disciplinary action against the Defendants even should a violation by those Defendants be proven." (citing Osuch v. Gregory, 303 F. Supp. 2d 189, 194 (D. Conn. 2004))).  Accordingly, the Court will also dismiss Mickens's request for Defendants to be disciplined for the failure to state a claim under Section 1915(e)(2)(B)(ii).

### 3.  Section 1983 Official-Capacity Claims for Monetary Damages

As indicated above, it is unclear from the complaint whether Mickens asserts Section 1983 claims against Defendants in their official capacities.  Nevertheless, because the Court must liberally construe the complaint due to Mickens's pro se status, the Court construes that Mickens's reference to official-capacity claims as part of his improperly included legal discussion in his complaint as a demonstration of his intent to assert claims against Defendants in their official capacities.  See (Doc. No. 1 at 15 ("Eleventh Amendment immunity is not a bar to Petitioner's § 1983 claims for money damages against the Defendants in their individual capacities or for injunctive or declaratory relief in their official capacities." (citations omitted))); see also Chevy Chase Bank, F.S.B. v. Carrington, No. 09-cv-02132, 2010 WL 745771, at *4 (M.D. Fla. Mar. 1, 2010) (explaining that plaintiff's use of "lengthy legal arguments, case citations, and quotations from treatises," which are "material proper in legal memoranda, but almost never proper in a complaint").  Since the Court has already concluded that Mickens's requests for equitable relief are subject to dismissal, only his request for monetary damages against Defendants in their official capacities remains.  As explained below, Mickens cannot

14

recover monetary damages from Defendants in their official capacities because the Eleventh

Amendment precludes these claims.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall

not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

See U.S. Const. amend. XI.  This Amendment

> has been interpreted to render states—and, by extension, state agencies and departments and officials when the state is the real party in interest—generally immune from suit by private parties in federal court.  Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens."

See Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002) (quoting

Alden v. Maine, 527 U.S. 706, 751 (1999)).  SCI Rockview, as part of the DOC, "shares in the

Commonwealth [of Pennsylvania's] Eleventh Amendment immunity."  See Lavia v. Pa. Dep't of

Corr., 224 F.3d 190, 195 (3d Cir. 2000); Sollenberger v. United States, No. 22-cv-01602, 2022

WL 10208223, at *2 (M.D. Pa. Oct. 17, 2022) (dismissing pro se plaintiff's Section 1983 claims

against SCI Rockview because, inter alia, it was entitled to Eleventh Amendment immunity).

The Eleventh Amendment also bars claims against state officials acting in their official

capacities because such claims are considered to be claims against the employing government

agency, which in this case is the DOC.  See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71

(1989) ("[A] suit against a state official in his or her official capacity is not a suit against the

official but rather is a suit against the official's office. As such, it is no different from a suit

against the State itself."); A.W. v. Jersey City Pub. Schs., 341 F.3d 234, 238 (3d Cir. 2003)

(explaining that Eleventh Amendment immunity "extends to state agencies as well as state

officials sued in their official capacities for monetary damages").[8]  "Eleventh Amendment immunity is, however, subject to three primary exceptions: (1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law."  See Pa. Fed'n of Sportsmen's Clubs, 297 F.3d at 323 (citation omitted).  None of these exceptions apply in this case.

As for the first exception to Eleventh Amendment immunity, Congress did not intend to abrogate Eleventh Amendment immunity by enacting Section 1983.  See Quern v. Jordan, 440 U.S. 332, 344–45 (1979) (stating that "§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States").  Concerning the second exception, the Commonwealth of Pennsylvania has not waived its Eleventh Amendment immunity from suit in federal courts.  See 42 Pa. C.S. § 8521(b) ("Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States."); see also Lavia, 224 F.3d at 195 (explaining that Pennsylvania has not waived its Eleventh Amendment immunity).  For the final exception, the Court has already determined that Mickens's claims for injunctive relief are subject to dismissal.  Thus, none of the exceptions to Eleventh Amendment immunity apply here.  Accordingly, the Court will dismiss Mickens's Section 1983 claims for monetary damages against Defendants in their official capacities.

---

[8]  However, "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983.  The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts."  See Hafer v. Melo, 502 U.S. 21, 31 (1991).

### 4.    Section 1983 Conspiracy Claim

It appears that Mickens attempts to raise a Section 1983 conspiracy claim against Defendants.  (Doc. No. 1 at 14.)  If so, he has failed to state a plausible claim for relief.

"[T]o prevail on a conspiracy claim under § 1983, a plaintiff must [show] that persons acting under color of state law reached an understanding to deprive [the plaintiff] of [their] constitutional rights."  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293–94 (3d Cir. 2018) (citation and internal quotation marks omitted).  A conspiracy requires a showing that the conspirators "somehow reached an understanding to deny" the plaintiff's rights.  See id. at 295 (citation and internal quotation marks omitted); Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010) (recognizing that, in order "to properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred[,] and that, this "require[s] enough factual matter (taken as true) to suggest that an agreement was made, in other words, plausible grounds to infer an agreement" (citation, internal citation, and internal quotation marks omitted)).  A conspiracy also requires a showing that "one or more of the conspirators perform[ed] . . . an[ ] overt act in furtherance of the conspiracy" and that the "overt act injure[d] the plaintiff in his person or property or deprive[d] the plaintiff of any right or privilege of a citizen of the United States[.]"  See Jutrowski, 904 F.3d at 294 n.15 (quoting Barnes Found. v. Twp. of Lower Merion, 242 F.3d 151, 162 (3d Cir. 2001)).  As such, a plausible conspiracy "requires that the state actors took concerted action based on an agreement to deprive the plaintiff of their constitutional rights, and that there was an actual underlying constitutional violation of the plaintiff's rights."  See Harvard v. Cesnalis, 973 F.3d 190, 207 (3d Cir. 2020) (citation and internal quotation marks omitted).

Here, Mickens fails to allege facts establishing the requisite elements of a conspiracy claim, namely, that Defendants acted together in any way to deprive him of his rights. Even accepting the allegations in the complaint as true and construing them in the light most favorable to Mickens, the complaint lacks sufficient factual allegations showing that Defendants reached an understanding to deprive him of his federally protected rights or that Defendants took any concerted action based upon that agreement. Rather, Mickens alleges only that Defendants' individual actions ultimately caused him constitutional harm, and that there must have been, therefore, a conspiracy amongst Defendants because of the order in which those individual actions occurred. "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." See Perez v. Gamez, No. 13-cv-01552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013) (citation omitted); see generally Twombly, 550 U.S. at 556 (explaining that, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). Instead, Mickens must allege sufficient factual matter to show that Defendants reached an agreement to deprive him of his federally protected rights and that they took concerted action to achieve that agreement. See Twombly, 550 U.S. at 556 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). Because Mickens fails to assert his Section 1983 conspiracy claim with factual sufficiency, the Court will dismiss it under Section 1915(e)(2)(B)(ii) for the failure to state a plausible claim for relief.

### 5. Pollock's Use of "Foul and Vulgar Language"

Mickens complains about Pollock's use of homophobic, racist, "foul[,] and vulgar language" on May 11 and 17, 2023.  (Doc. No. 1 at 5, 9.)  Although it is unclear whether Mickens attempts to raise a standalone Section 1983 claim for an Eighth Amendment violation based on the use of this language, to the extent he is attempting to do so, he has failed to plead a plausible claim for relief under Section 1983.

"[C]onduct such as verbal harassment, taunting, and the use of profanity, without any injury or threat thereof, is inadequate to plausibly state a constitutional violation under the Eighth Amendment."  Hensley v. Pa. Dep't of Corr., No. 23-cv-01327, 2024 WL 197671, at *7 (M.D. Pa. Jan. 18, 2024) (citations omitted); see, e.g., Sears v. McCoy, 815 F. App'x 668, 670 (3d Cir. 2020) (unpublished) ("The District Court properly dismissed at screening Sears's verbal harassment claims based on McCoy's name-calling and use of sexually explicit, offensive language.  A prisoner's allegations of verbal harassment, unaccompanied by another injury, are not cognizable under § 1983.").  In addition, "racially discriminatory statements, such as racial slurs and epithets, without more, also do not establish liability under § 1983."  See Matthews v. Beard, No. 11-cv-00221, 2013 WL 1291288, at *6 (W.D. Pa. Mar. 27, 2013) (citing cases).  Therefore, Mickens has failed to plead a plausible Section 1983 claim for an Eighth Amendment violation based on Pollock's alleged comments on May 11 and 17, 2023, and the Court will dismiss it pursuant to Section 1915(e)(2)(B)(ii).

### 6. Section 1983 Individual-Capacity Claims for Monetary Damages

Mickens seeks "monetary compensation not to exceed the statutory limit under 42 Pa. C.S. § 8528."  See (Doc. No. 1 at 8).  To the extent that this constitutes a request for compensatory damages, the Court will dismiss this claim.

The Prison Litigation Reform Act ("PLRA") prevents a prisoner asserting a Section 1983 claim from seeking compensatory damages for mental or emotional injuries without a showing of physical injury. See 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).."); Mitchell v. Horn, 318 F.3d 523, 533 (3d Cir. 2003) ("Section 1997e(e)'s requirement that a prisoner demonstrate physical injury before [they] can recover for mental or emotional injury applies only to claims for compensatory damages.").[9] Here, Mickens does not allege that he suffered any physical injury due to a constitutional violation. Therefore, the PLRA precludes Mickens from seeking compensatory damages in this case, and the Court will dismiss his request for compensatory damages.

### B.    Defendants' Motion to Dismiss

Defendants move for dismissal of Mickens's complaint on two (2) grounds. (Doc. No. 11 at 7.) First, they seek dismissal of Mickens's retaliation claims against Clark and Haldeman based on their denials of his grievances for lack of personal involvement. (Id. at 7–9.) Second, they assert that Mickens has failed to plead plausible retaliation claims against them because none of their alleged actions were sufficiently adverse to rise to the level of a constitutional violation. (Id. at 10–16.) The Court addresses each argument in turn.

---

[9]  It does not, however, prevent a plaintiff from seeking nominal or punitive damages. See Mitchell, 318 F.3d at 533 ("§ 1997e(e) does not apply to claims seeking injunctive or declaratory relief."); Allah v. Al-Hafeez, 226 F.3d 247, 251–52 (3d Cir. 2000) (explaining that Section 1997e(e) does not preclude a prisoner Section 1983 plaintiff from recovering nominal or punitive damages (citations omitted)). Since Mickens does not reference punitive damages in his complaint, the Court has not addressed whether his allegations would support an award of punitive damages.

### 1.    Haldeman and Clark's Personal Involvement

Defendants argue that Mickens has failed to allege plausible Section 1983 claims against Clark and Haldeman relating solely to their denials of his grievances because their handling of his grievances is insufficient to show their personal involvement in any constitutional violation. The Court agrees.

In general, a plaintiff asserting a Section 1983 claim must allege that each defendant was personally involved in the act or acts that they claim violated their federally protected rights.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "A plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct."  Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (citing Rode, 845 F.2d at 1207); Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (stating that "[p]ersonal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence'" (quoting Rode, 845 F.2d at 1207)).  Thus, in pursuing any Section 1983 claim against prison officials, a plaintiff may not rely solely on respondeat superior, see Rode, 845 F2d at 1207 (citation omitted), which is a theory of liability that "arises 'solely on the basis of the existence of an employer-employee relationship,' regardless of whether the employer had any part in causing harm[,]" see Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 692 (1978)).  Instead, if a plaintiff seeks to hold a supervisor liable for unconstitutional acts by their subordinates, the plaintiff's allegations must satisfy one of two theories of supervisory liability: First, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused

21

[the] constitutional harm[;]" and second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  See A.M. ex rel. J.M.K. v. Luzerne County Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim and describing "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates"), rev'd on other grounds sub nom., Taylor v. Barkes, 575 U.S. 822 (2015).

To allege a plausible claim for supervisory liability under the first theory—the policy-and-practice strand of supervisory liability—a plaintiff must

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. Put another way, the inmate must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury.

See Chavarriaga, 806 F.3d at 227 (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).  For the second theory of supervisory liability—participating in, directing others to, or knowledge and acquiescence of constitutional violation—generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  See Saisi v. Murray, 822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held

liable 'simply because of [their] position as the head of the [agency].'" (quoting Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005))); Zigler v. Warren, No. 21-cv-19474, 2022 WL 903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the unconstitutional conduct of [their] employees solely because [they are] a supervisor.").  Additionally, "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."  See Chavarriaga, 806 F.3d at 222 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995); Rode, 845 F.2d at 1201 n.6).

In this case, Mickens does not attempt to hold Clark or Haldeman liable under Section 1983 based on the first theory of supervisory liability, i.e., a policy or practice.  Instead, he focuses solely on their alleged knowledge of and acquiescence to other Defendants' alleged misconduct.

Concerning Haldeman, her only alleged involvement was her issuance of an Initial Review Response on September 14, 2023, denying Mickens's August 24, 2023 grievance against Clark as frivolous.  (Doc. No. 1 at 6–7, 10–11.)  In most instances, the mere filing of a grievance is insufficient to impute the actual knowledge that is necessary to demonstrate a defendant's personal involvement in an asserted constitutional violation.  See Rode, 845 F.2d at 1207–08 (finding that the filing of a grievance with the Governor-defendant's office was insufficient to demonstrate that the Governor himself had personal knowledge of the alleged wrongdoing).  Additionally, grievances that complain of events that have already occurred and that are in the past are insufficient to show that defendants who respond to such grievances were personally involved in the asserted constitutional violations.  See, e.g., Robles v. Casey, No. 10-cv-02663, 2011 WL 398203, at *2 (M.D. Pa. Feb. 3, 2011) (concluding that plaintiff had not shown

personal involvement where "plaintiff's grievance only reported violations that had occurred in the past").

Mickens argues that he can demonstrate personal involvement because "Haldeman, as Major of Unit Management, directly supervises . . . Clark as . . . Clark is Unit Manager of both CA and CB Units." See (Doc. No. 17 at 6). As such, Haldeman had direct supervisory authority over the subordinate actor, Clark, which is sufficient for supervisory liability. (Id. (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293–94 (3d Cir. 1997), abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006))).

Setting aside the fact that Mickens's factual assertion about Haldeman supervising Clark is not included as an allegation in the complaint, even if the allegation was in the complaint and the Court accepted it as true, it would not show that Haldeman was personally involved in violating his constitutional rights. In the first instance, Mickens's reliance on the Third Circuit Court of Appeals' decision in Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997) in support of his argument is misplaced.

In Robinson, the Third Circuit addressed, inter alia, whether the district court erred in granting defendants' motion for judgment as a matter of law as to the plaintiff's Section 1983 claim against an assistant police chief because there was insufficient evidence showing that this defendant knew or and acquiesced in another police officer's sexual harassment of a subordinate officer. See 120 F.3d at 1291, 1293–94. The Third Circuit agreed with the assistant police chief that the district court properly granted judgment in their favor as a matter of law because the assistant police chief "possessed no actual supervisory authority over" the officer committing the alleged sexual harassment. See id. at 1294. The Third Circuit explained as follows:

> Our cases have held that "actual knowledge and acquiescence" suffices for supervisory liability because it can be equated with "personal direction" and "direct

24

discrimination by the supervisor." Id. (quoting Rode, 845 F.2d at 1207). Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor "acquiesced" in (i.e., tacitly assented to or accepted) the subordinate's conduct. But where actual supervisory authority is lacking, mere inaction, in most circumstances, does not reasonably give rise to a similar inference. As a general matter, a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have "acquiesced" in the latter's conduct.

General tort principles provide a useful analogy. Unless a "master"-"servant" relationship exists, the circumstances in which one person may be held liable for a tort committed by another are quite limited, see Restatement (Second) of Torts §§ 876–878 (1977), and none appears to be applicable here. A claim against a "master" based on a tort committed by a "servant" bears a resemblance to a § 1983 claim against a government supervisor based on a constitutional tort committed by a subordinate, but a person cannot be a "master" unless he or she has "the right to control the physical conduct" of the servant. Restatement (Second) of Agency § 2(1) (1957). By analogy, we hold that, except perhaps in unusual circumstances, a government official or employee who lacks supervisory authority over the person who commits a constitutional tort cannot be held, based on mere inaction, to have "acquiesced" in the unconstitutional conduct.

See id. (internal footnotes omitted).

The Third Circuit's explanation supports Mickens's personal-involvement argument only insofar as Haldeman, presuming she was Clark's supervisor, conceivably could be liable for Clark's conduct if she had actual knowledge and acquiescence of it because Haldeman had supervisory authority over Clark. Mickens ignores the fact that his allegations show only that Haldeman first learned of Clark's alleged retaliation when he reviewed Mickens's grievance, and there are no allegations showing that Haldeman did anything else other than allegedly fail to properly investigate that grievance in the manner Mickens believes she should have investigated it and ultimately deny the grievance. See King v. Zamiara, 680 F.3d 686, 696–97 (6th Cir. 2012) ("Having the right to control the offending employee is not enough, simply being aware of the misconduct is not enough, and even administrative approval of an action later found to be retaliatory, without more, is not enough."). In Robinson, when addressing a similar factual

situation pertaining to a different supervisory defendant, where there was no evidence showing that the supervisory defendant had knowledge of any alleged misconduct by a supervisee prior to a plaintiff's complaint, the Third Circuit declined to find said supervisory defendant liable under Section 1983. See id. at 1295 (concluding that the district court properly granted judgment as a matter of law in favor of police chief on the plaintiff's Section 1983 claim because there was no evidence that the police chief "had any knowledge of any alleged harassment" before being informed of the plaintiff's complaint alleging sexual harassment); see also Lawson v. Banta, No. 20-3444, 2022 WL 1772997, at *2 (3d Cir. June 1, 2022) ("[A] defendant's knowledge of a constitutional violation after it occurred is insufficient to show that she personally directed that violation or had actual knowledge of it at the time it occurred." (citing Rode, 845 F.2d at 1208)).

The Court recognizes that the Third Circuit has, under certain, limited circumstances, determined that a supervisory official's response to a grievance may show actual knowledge of and acquiescence in the events forming the basis of the plaintiff's asserted constitutional claims. See, e.g., Sutton v. Rasheed, 323 F.3d 236, 249–50 (3d Cir. 2003), as amended (May 29, 2003) (finding that prisoner-plaintiffs had established the personal involvement of a defendant who had played an "active role" in the continued denial of their access to religious texts and basing this finding, in part, on the fact that the defendant had issued a written response denying a final-grievance-appeal letter from one of the plaintiffs, which requested access to such religious texts); Johnson v. Wireman, 809 F. App'x 97, 100 (3d Cir. 2020) (unpublished) (concluding that plaintiff's allegations that state prison superintendent's and grievance officer's responses to grievances which went beyond merely denying the grievances to allegedly coerce the plaintiff to change his religious practices showed sufficient personal involvement); Diaz v. Palakovich, 448 F. App'x 211, 215 (3d Cir. 2011) (unpublished) (vacating district court's grant of summary

judgment where the district court failed to consider grievances pertaining to a pattern of ongoing wrongful conduct, and explaining that a reasonable factfinder could find that (a) the defendants had knowledge of such wrongful conduct through the prisoner's grievances and (b) had acquiesced in such conduct by failing to address the ongoing pattern of wrongful conduct). However, the facts in those cases involved either: (1) the supervisory officials response to the grievances constituting an alleged constitutional violation, such as by encouraging the plaintiff to change their religious practices, see Sutton, 323 F.3d at 249–50 (determining that evidence showing that supervisory official responded to final appeal of grievance in which the plaintiff complained that he was denied religious texts by criticizing those texts, "appear[ed] to have play an active role" in the alleged constitutional violation); Johnson, 809 F. App'x at 100 & n.20 (concluding that district court erred in dismissing the plaintiff's claims for First Amendment violations against grievance officer and prison superintendent because the plaintiff alleged that the grievance officer and superintendent advised the plaintiff to observe the fasting practice of a different religion); or (2) the supervisory officials learned about the alleged constitutional violations through a grievance and acquiesced in the violations by failing to address an ongoing constitutional violation, see Diaz, 448 F. App'x at 215 (concluding that "a reasonable factfinder could find that these [supervisory] defendants had knowledge of the violations through [the plaintiff's] grievances and acquiesced in the violations by failing to address a practice of opening legal mail outside of an inmate's presence").

 Mickens's factual allegations against Haldeman here are dissimilar to the evidence and allegations in those Third Circuit cases because Mickens has not alleged an ongoing constitutional violation or that Haldeman's response constituted unlawful retaliation in violation

of the First Amendment.[10]  Instead, his allegations against Haldeman pertain only to how Haldeman handled his grievance, which, as explained above, is insufficient to plausibly allege Haldeman's personal involvement in any constitutional violation.  See Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (affirming district court's grant of summary judgement for supervisor who was "kept abreast" of an investigation, but did not direct his subordinate "to take or not to take any particular action"); Murray v. McCoy, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) (explaining that prison superintendent's "awareness of [the plaintiff's] allegations concerning [the defendant correctional officer], without more, is insufficient to establish personal involvement"); Iwanicki v. Pa. Dep't of Corr., 582 F. App'x 75, 79 (3d Cir. 2014) (unpublished) ("[M]ere notification of a grievance does not allege sufficient personal involvement because it does not establish that the Defendants personally directed or acquiesced in the retaliation." (citation omitted)).  Moreover, Mickens's grievance pertained to an incident that has already occurred, so Haldeman's investigation and decision on that grievance is insufficient to demonstrate personal involvement.  See Sims v. Wexford Health Sources, 635 F. App'x 16, 19–20 (3d Cir. 2015) (unpublished) ("If an official's only involvement is the investigation or adjudication of an inmate grievance after the event giving rise to the grievance has happened, that is not considered to be personal involvement." (citing Rode, 845 F.2d at 1208)); see also Mincy v. Chmielsewski, 508 F. App'x 99, 104 (3d Cir. 2013) (unpublished) ("[T]he District Court is correct that an officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement.") (citation omitted)).

---

[10]  Mickens could not allege that Haldeman's response to his grievance constituted unlawful retaliation because "[t]he denial of grievances is not an adverse action for retaliation purposes." See Owens v. Coleman, 629 F. App'x 163, 167 (3d Cir. 2015) (unpublished) (citations and internal quotation marks omitted).

As for Mickens's Section 1983 retaliation claim against Clark based solely on her denial of two (2) of his grievances, the above reasoning applies equally to this claim.[11]  In this regard, Mickens's complaints about Clark's conduct relate only to her investigations and denials of his grievances.  In addition, Clark investigated Mickens's allegations about two (2) incidents that had already occurred.  Further, there are no allegations in the complaint that Clark was aware of an ongoing practice of retaliatory actions by Pollock or Taylor, especially considering there was a span of over two (2) months between the filing of the two grievances she reviewed, Mickens's May 17, 2023 grievance does not appear to mention his belief that Pollock had retaliated against him, and Mickens does not allege that Pollock or Taylor further retaliated against him after Clark's Initial Review Response to his July 27, 2023 grievance, nor could he, because he was transferred away from CB Unit prior to Clark's response to the grievance.  In other words, simply because Clark did not investigate Mickens's two (2) grievances in the manner he believes they should have been investigated, and ultimately denied the grievances, does not show that she somehow knew of and acquiesced to any constitutional violations against him.  Accordingly, Mickens's Section 1983 claims against Clark and Haldeman based solely on their investigations and resolutions of Mickens's grievances will be dismissed under Rule 12(b)(6) for the failure to state a plausible claim for relief.

### 2. Adverse Actions

Defendants move for dismissal of Mickens's retaliation claims because he does not allege that any action taken against him was sufficiently adverse to rise to the level of a First Amendment violation.  (Doc. No. 11 at 10–16.)  The Court agrees.

---

[11]  The Court addresses Mickens's allegations relating to his August 2023 cell transfer infra.

### a.    Elements of First Amendment Retaliation Claim

To plead a prima facie First Amendment retaliation claim, a plaintiff must allege that: "(1) [their] conduct was constitutionally protected; (2) [they] suffered an adverse action at the hands of prison officials; and (3) [their] constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [them]."  See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted).  As for the first element of a plaintiff's prima facie case, the filing of lawsuits and prison grievances constitutes activity protected by the First Amendment. See id. (reiterating prior holding that a prisoner-plaintiff engages in constitutionally protected activity when they file a grievance against a prison official (citing Mitchell, 318 F.3d at 530)); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (acknowledging its prior holding "that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts" (citation omitted)); Allah v. Seiverling, 229 F.3d 220, 223–25 (3d Cir. 2000) (concluding that the prisoner-plaintiff stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials).

Regarding the second element of a plaintiff's prima facie case, an adverse action is one that is "sufficient to deter a person of ordinary firmness from exercising [their] [constitutional] rights[.]"  See Mitchell, 318 F.3d at 530 (second alteration in original) (citations and internal quotation marks omitted); Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015) (explaining that an adverse action must be "sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights . . ." (citation omitted)).  However, to be actionable under Section 1983, the alleged adverse action must be more than de minimis.  See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct

"need not be great in order to be actionable, but it must be more than de minimis" (citations and internal quotation marks omitted)).

And, finally, with respect to the third element of a plaintiff's prima facie case, the Court observes that, "[b]ecause motivation is almost never subject to proof by direct evidence," a plaintiff must typically "rely on circumstantial evidence to prove a retaliatory motive." See Watson, 834 F.3d at 422. The plaintiff "can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." See id. (footnote omitted).

### b.    May 11, 2023 Incident

Mickens alleges that while out of his cell on May 11, 2023, he overheard Pollock and another correctional officer making homophobic remarks and using the n-word. (Doc. No. 1 at 5, 9.) Upon Mickens asking them to whom they were speaking, he was ordered to return to his cell. (Id.) These allegations are insufficient to show adverse action as a matter of law.

As indicated above, the alleged incident must be sufficiently adverse to deter a person of ordinary firmness from exercising their First Amendment rights. The alleged comments by Pollock and the other correctional officer, even if "unprofessional and unpleasant" do not constitute sufficiently adverse action to support Mickens's retaliation claim.[12] See Requena v.

---

[12] Although Mickens asserts in his opposition brief that he "felt that [Pollock and the other correctional officer's] slurs were directed at him personally" because Mickens was in a relatively small area with only a few other inmates at the time, his allegations in the complaint are insufficient for the Court to reasonably infer that the slurs used were about him and not about another inmate (or even another person generally). Further, simply because Pollock ordered Mickens to return to his cell after Mickens asked about to whom Pollock and the other correctional officer were speaking, does not allow this Court to reasonably infer that the comments were about him. Mickens does not assert that he was entitled to a response to his question, and it is equally as likely that they ordered him to return to his cell for other reasons,

Roberts, 893 F.3d 1195, 1211 (10th Cir. 2018) ("To the extent [that the plaintiff's] retaliation

claim is based on [the defendant correctional officer] calling him a 'dumb Indian,' 'harassing him

"all night" while in segregation, and placing him on 'nutraloaf' without following proper

procedure, such actions alone, although unprofessional and unpleasant, do not constitute adverse

action sufficient to support a retaliation claim." (citations omitted)).   "The First Amendment does

not shield prisoners from insults or offensive statements.  Verbal comments alone do not rise to

the level of a constitutional claim in the prison context."  Lingenfelter v. Liptak, No. 19-cv-

02214, 2020 WL 3104007, at *3 (M.D. Pa. June 11, 2020) (citations omitted); see also Davis v.

Goord, 320 F.3d 346, 353 (2d Cir. 2003) (explaining that "[i]nsulting or disrespectful comments

directed at an inmate generally do not rise" to the level of adverse conduct); McDowell v. Jones,

990 F.2d 433, 434 (8th Cir. 1993) ("[V]erbal threats and name calling usually are not actionable

under § 1983.").  Therefore, Pollock's alleged comments on May 11, 2023, cannot form the basis

of a First Amendment retaliation claim.  See, e.g., Antoine v. Uchtman, 275 F. App'x 539, 541

(7th Cir. 2008) (unpublished) (determining that correctional officers' threats and racist remarks

were not sufficiently adverse to deter an inmate from engaging in protected conduct); Henry v.

CO#2 Gilara, No. 16-cv-00167, 2017 WL 3424863, at *2 (W.D. Pa. Aug. 9, 2017) (concluding

that the prisoner-plaintiff failed to plead plausible adverse action as a matter of law where the

plaintiff alleged that the correctional officer defendant allegedly made unprofessional comments

about the plaintiff's sexual orientation).

---

such as not wanting to be overheard or bothered, as it is that they were covering up commenting
about him.  Regardless, the Court presumes, for sake of argument, that Pollock and the other
correctional officer's remarks were directed towards Mickens.

### c.    May 17, 2023 Incident

Mickens alleges that Pollock yelled to him, "Take down your fu**ing tent, dickhead," on May 17, 2023.  (Doc. No. 1 at 5, 9.)  At the time, Mickens was using a "curtain" to partially obstruct the view while he was sitting on the toilet.  (Id.)  Mickens acknowledges that this was against the rules; however, he avers that using a curtain to partially conceal oneself was "traditionally done by all inmates without consequence."  See (id.).  These allegations are insufficient as a matter of law to show an adverse action.

Pollock's alleged use of the word "dickhead" to refer to Mickens constitutes name-calling, which is not sufficiently adverse to deter an inmate from engaging in protected conduct for the reasons already stated.  See, e.g., Thornsberry v. Kelly, No. 21-cv-00113, 2024 WL 3992329, at *2 (E.D. Ark. Aug. 29, 2024) ("Name calling alone generally . . . does not chin the bar for chilling retaliatory conduct." (citation omitted)); Thomas v. Traficanti, 23-cv-02286, 2024 WL 1909130, at *3–4 (N.D. Ohio May 1, 2024) (determining that prisoner-plaintiff failed to allege adverse action in support of First Amendment retaliation claim based on "name calling of sorts" because "[n]ame-calling is a de minimis action that does not violate the [C]onstitution" (citation omitted)).  Additionally, even if Pollock's language could be considered harsh, it still would not constitute adverse action.  See Greer v. York County Prison, 07-cv-02248, 2008 WL 3819866, at *2 (M.D. Pa. Aug. 11, 2008) ("Mere words spoken to a prisoner by a correctional officer, even when those words are harsh, do not amount to a violation of the prisoner's civil rights." (citing Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973) and Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979))).  Moreover, Pollock directing Mickens to remove his curtain, the use of which Mickens recognizes was against the prison's rules, on one (1) occasion, is de minimis regardless of whether other inmates are purportedly permitted to do so.  Mickens

also was not treated differently than those other inmates in the most relevant manner, as he points out that the other inmates were permitted to use curtains to partially obstruct views "without consequence," and he does not allege that Pollock issued him a misconduct. Rather, Pollock directed him to simply remove the item partially blocking the view. Accordingly, Mickens has failed to plead sufficient adversity based on Pollock's actions on May 17, 2023.

### d.    July 24, 2023 Incident

Mickens alleges that Pollock and Taylor retaliated against him on July 24, 2023, by initially telling him that they were not handing out visit passes when Mickens first approached them at 12:20 p.m. to obtain his pass to attend a visit with his family, and then ordering Mickens to return to his cell. (Doc. No. 1 at 5–6, 10.) Taylor and Pollock did, however, allegedly provide visit passes to two (2) other inmates at 12:15 p.m., which meant that they lied to Mickens about not calling for visit passes yet. (Id.) Approximately forty-five (45) minutes later, Mickens returned to Pollock and Taylor and asked to get his visit pass, only to be told, "It's not our job to worry about your visit," and then was apparently given his visit pass. (Id.) This alleged conduct is also insufficiently adverse to constitute adverse action as a matter of law.

For purposes of analyzing Mickens's retaliation claim here, the Court presumes that the denial of family visitation on one (1) occasion is sufficient to deter a person of ordinary firmness from exercising their constitutional rights. Compare Hill v. Barnacle, 509 F. Supp. 3d 380, 392 (W.D. Pa. 2020) ("[T]he suspension of [the plaintiff's] visitation privileges constitutes an adverse action . . . ."), and Cooper v. Hoover, No. 18-cv-00729, 2006 WL 3544711, at *2 (M.D. Pa. Dec. 8, 2006) (concluding that prisoner-plaintiff's allegation that he was denied a visit from his daughter because he challenged his sentence stated a valid First Amendment retaliation claim), with Jones v. Fischer, No. 10-cv-01331, 2012 WL 1899004, at *14 (N.D.N.Y. May 1, 2012)

("Even if plaintiff had been <u>denied</u> his visit on one occasion, it would not rise to the level of 'adverse action' for purposes of the retaliation analysis." (citation and internal footnote omitted)), <u>report and recommendation adopted</u>, 2012 WL 1898947 (N.D.N.Y. May 23, 2012), <u>abrogated on other grounds by</u> <u>Widomski v. State Univ. of N.Y. (SUNY) at Orange</u>, 748 F.3d 471 (2d Cir. 2014); <u>Mateo v. Heath</u>, No. 11-cv-00636, 2012 WL 1075836, at *4 (S.D.N.Y. Mar. 29, 2012) ("An act need not rise to the level of a constitutional violation to be considered an 'adverse action' for a retaliation claim.  But a single denial of visitation, even if intentional and unjustified, is nevertheless unlikely to chill a person of ordinary firmness from continuing to exercise his right to file grievances." (internal citations omitted)).  Even so presuming, Mickens has failed to allege sufficient adverse action through the slight <u>delay</u> in his family visit on July 24, 2023.

Mickens attempts to overcome this insufficiency by arguing, <u>inter</u> <u>alia</u>, (1) Taylor and Pollock initially denied his visit, (2) the visiting room officers had discretion to refuse him entry to have his visit, (3) Taylor and Pollock could have hoped that the visiting room officers would refuse Mickens admission to his visit due to his late arrival, and (4) neither Taylor nor Pollock called the visiting room officers to inform them that it was their fault that Mickens arrived late to the visitation room.  (Doc. No. 17 at 9–10.)  None of these arguments have merit.  Whether Taylor and Pollock initially denied Mickens's visit is irrelevant because they ultimately gave him a pass to go to his visit when Mickens asked them about it again.  Initially denying a visit pass to an inmate when they first ask for it only to give it to them when they ask for it again a short time later is <u>de</u> <u>minimis</u> conduct that would not deter a person of ordinary firmness from exercising their constitutional rights.  Additionally, if Taylor and Pollock's "true intention was to effectively deny Mickens his visit," <u>see</u> (Doc. No. 17 at 10), all they seemingly had to do was refuse to give

him the pass when he asked about it a second time.  But that is not what they did; instead, Mickens asked for his pass, and they gave it to him.  Furthermore, Mickens's argument about Taylor and Pollock "hop[ing]" that the other officers would deny him admission to the visitation room does not save his claim because Mickens had his visit with his family.  See (id.)  An adverse action does not occur when correctional officers give an inmate their visit pass while not informing the inmate that they hope that the other correctional officers supervising the visitation room, who have discretion whether to allow the inmate to belatedly appear for their visit, will deny the inmate admission for the visit.  Overall, Mickens has not plausibly pleaded that Taylor and Pollock's actions on July 24, 2023, were sufficiently adverse for this Court to allow Mickens's retaliation claim to move forward.[13]

---

[13]  Although not raised by Defendants, there is another deficiency with Mickens's retaliation claim here, namely, he has failed to plead a sufficient causal connection between any protected activity and Pollock and Taylor's actions that allegedly constituted retaliation.  As explained above, for there to be a causal connection between Mickens's protected activity and the action that allegedly constituted retaliation, Mickens must plead facts show either a suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing to establish a causal link.  See Mearin v. Greene, 555 F. App'x 156, 158–59 (3d Cir. 2014) (unpublished) (citing Lauren W. ex. rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007)). The Third Circuit has explained that, in the Title VII retaliation context, "'[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity,' seven (7) days was "in the realm of what this Court and others have found sufficient . . . ."  See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012) (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007)); see also Brennan v. Norton, 350 F.3d 399, 420 (3d Cir. 2003) ("The causation required to establish a [First Amendment retaliation] claim under § 1983 is identical to that required under Title VII.").

In this case, Mickens alleges that he contacted the Pennsylvania Prison Society at an unknown date prior to May 11, 2023, filed a grievance against Pollock on May 11, 2023, and filed a grievance about Pollock on May 17, 2023.  (Doc. No. 1 at 5, 9–10.)  Mickens's allegations about the alleged misconduct on July 24, 2023, more than two (2) months after the filing of his last grievance, are insufficient to show a suggestive temporal proximity between the protected activity (the filing of his grievances) and the allegedly retaliatory action by Taylor and Pollock. Further, he has not alleged a pattern of antagonism between May 17, 2023, and July 24, 2023. See Watson, 834 F.3d at 424 (explaining that where temporal proximity is not so close as to be

### e.    August 15, 2023 Incident

Mickens alleges that Clark retaliated against him for his grievances against "correctional officers" and his complaints to the PPS by transferring him from his cell on CB Unit to a cell on CA Unit on August 15, 2023.  (Doc. No. 1 at 6–7, 10–11.)  Mickens's belief that Clark's action was retaliatory was confirmed by an unidentified correctional officer, who told Mickens the reason for his transfer.  (Id.)  In addition, Clark did not move Mickens's cellmate as well, and she moved another inmate into the new cell with Mickens instead of honoring a cell agreement between Mickens and his former cellmate, which was approved by the CA Unit's block sergeant, after Mickens was moved to CA Unit.  (Id.)  These allegations are insufficient to show he suffered an adverse action.

Under certain factual circumstances, an inmate's transfer to a different cell can constitute adverse action for purposes of a First Amendment retaliation claim.  See Lawson v. Crowther, No. 17-cv-00039, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) ("Whether a [cell] transfer [constitutes adverse action] 'will depend on the facts of the particular case.'" (quoting Allah, 229 F.3d at 225)), report and recommendation adopted, 2018 WL 6523185 (W.D. Pa. Dec. 12, 2018). These factual circumstances include, inter alia (1) placement in lockdown and transfer to restrictive housing, administrative confinement, or disciplinary confinement, see Palmore v. Hornberger, 813 F. App'x 68, 70 (3d Cir. 2020) (unpublished) (explaining that "being placed in lockdown [and] being moved to restricted housing . . . are more than 'de minimis' adverse actions" (citation omitted)); Lawson, 2018 WL 6524380, at *3 (indicating that "a transfer into

---

unduly suggestive, the appropriate test is "timing plus other evidence" (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)); Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir. 2003) (indicating that "other evidence" of retaliatory animus might include a "constant barrage of written and verbal warnings" or "disciplinary action").  Therefore, Mickens's allegations also fail to satisfy the causation element of a prima facie retaliation claim.

administrative or restrictive confinement . . . might represent an adverse action"); Dunbar v.
Barone, 487 F. App'x 721, 723 (3d Cir. 2012) (unpublished) (stating that "placement in
administrative segregation that severely limited access to the commissary, library, recreation, and
rehabilitative programs" was "sufficient to establish adversity"); (2) transfer into a cell with a
cellmate whom prison authorities knew previously threatened to kill the prisoner-plaintiff, see
Rinaldi v. United States, 904 F.3d 257, 269 (3d Cir. 2018); (3) transfer into a "dangerous cell
block," see Lawson, 2018 WL 6524380, at *3; (4) transfer into "undesirable cells," see Molina v.
Rivello, No. 23-cv-01111, 2023 WL 8359951, at *1, 4 (M.D. Pa. Dec. 1, 2023) (determining that
the prisoner-plaintiff's allegations that the defendants retaliated against him by "plac[ing] him in
cells 'contaminated with mold, rush, asbestos, and corrosion'" and "a cell with a leaking, broken
toilet" were sufficient to satisfy adverse action requirement of prima facie retaliation claim);
Griffin v. Malisko, No. 18-cv-01155, 2018 WL 5437743, at *3 (M.D. Pa. Oct. 29, 2018) ("[C]ell
transfers to undesirable areas of a prison could have a strong deterrent effect."); (5) transfer of an
immunocompromised inmate into a cell with a sick inmate, see Chruby v. Bearjar, No. 17-cv-
01631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018), report and recommendation
adopted, 2018 WL 4507599 (M.D. Pa. Sept. 19, 2018), aff'd, No. 24-1200, 2025 WL 325751 (3d
Cir. Jan. 29, 2025); and (6) transfer from a single cell into a double cell, see Montanez v. Keller,
No. 13-cv-02564, 2015 WL 273199, at *4 (M.D. Pa. Jan. 20, 2015), report and recommendation
adopted, 2015 WL 3604058 (M.D. Pa. June 5, 2015).  "In such cases, the cell transfers 'have a
strong deterrent effect."  Roman v. County of Chester, No. 23-cv-01662, 2024 WL 4844792, at
*12 (E.D. Pa. Nov. 20, 2024) (quoting Dillard v. Talamantes, No. 15-cv-00974, 2018 WL
1518565, at *11 (M.D. Pa. Mar. 28, 2018)).

On the other hand, courts have declined to find sufficient adversity caused by, inter alia, the following factual circumstances: (1) "transfer from one cellblock to another similar cellblock," Griffin, 2018 WL 5437743, at *3; (2) transfer "to a different cell, and failing to allow [the prisoner-plaintiff] to cell with the inmate of [their] choice in a cleaner, quieter cell," see Dillard, 2018 WL 1518565, at *11; (3) transfer to a cell with a faulty shower, see Owens, 629 F. App'x at 167 ("Owens' mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet the[ ] elements" of a First Amendment retaliation claim."); (4) transfer to an equivalent cell over a short period of time, see Lawson, 2018 WL 6524380, at *3 ("While transferring between equivalent cells within a short period of time may have been an annoyance, the Court cannot conclude that it would deter a person of ordinary firmness from exercising [their] constitutional rights."); (5) transfer to a "less desirous cell" where the prisoner-plaintiff "did not demonstrate that the living conditions [the prisoner] endured constituted an adverse action," see Verbanik v. Harlow, 512 F. App'x 120, 122 (3d Cir. 2013) (unpublished); see also Walker v. Sellers, No. 21-cv-00660, 2024 WL 943448, at *3 (E.D. Pa. Mar. 5, 2024) ("On its own, a movement from one cell to another where there is no pled material difference would not survive a motion to dismiss . . . ."); and (6) transfer from a double-bunk cell to another double-bunk cell in the same cell block, see Griffin v. Williams, No. 10-cv-02472, 2011 WL 3501787, at *6–7 (M.D. Pa. Aug. 10, 2011).  Essentially, courts have found these factual circumstances to be de minimis because they would not deter a person of ordinary firmness from exercising their constitutional rights.

In this case, Mickens's factual allegations fall into the de minimis category.  He alleges that he was moved to a different cell in a different unit of the prison.  He does not allege that this

cell transfer resulted in a less favorable placement in the prison or the loss of any privileges.[14]

He also does not allege that the cell itself was different insofar as he appears to have moved from

a double cell into another double cell.  His only complaint about his new cell appears to be that

he did not get to pick his cellmate; however, despite Mickens stating in his grievance that Clark's

alleged failure to honor his cell agreement violated prison policy, see (Doc. No. 1-4 at 3), he

acknowledges that the policy does not mandate that prison officials always follow an inmate's

expressed preference for a cellmate in a double cell.  See (id. ("Double-celling of inmates

generally shall be based on the inmate's expression of preferences affecting double-celling

compatibility.  An inmate's request generally shall be accommodated if circumstances permit and

provided that there are no contraindications (custody level, security needs, etc.) noted by staff."

(quoting Reception and Classification Procedures Manual, § 5.B.2.b.))).  In addition, while not

determinative, the Court notes that inmates do not have a constitutional right to choose a

cellmate.  See Murray v. Bledsoe, 650 F.3d 246, 247 (3d Cir. 2011).  Overall, Mickens's

allegations against Clark fail to show that his cell transfer was an adverse action.  See, e.g.,

Victor v. Huber, No. 12-cv-00282, 2012 WL 2564892, at *7 (M.D. Pa. Feb. 28, 2012) ("Inmates .

. . frequently invite courts to infer retaliatory motives to cell assignments and other prison

policies.  Yet, these invitations, while frequently made, are rarely embraced by the courts.").

Accordingly, the Court will dismiss Mickens's retaliation claim against Clark.[15]

---

[14]  It seems highly unlikely that Mickens would allege that he was in less favorable conditions considering that he allegedly got another inmate to agree to reside with him in his new cell.

[15]  Although it is irrelevant to the Court's resolution of Defendants' motion to dismiss Mickens's retaliation claim against Clark, the only allegation linking his cell transfer to possible retaliation is his allegation that another correctional officer told him that he was moved due to his grievances and complaint to the Pennsylvania Prison Society.  The timing of his cell transfer would not be suggestive of a causal connection insofar as it was approximately twenty-two (22) days after his last grievance referenced in the complaint (the grievance against Taylor and

C.    **Leave to Amend**

Having determined that Mickens's claims against Defendants are subject to dismissal, the

Court must determine whether to grant him leave to file an amended complaint.  Courts should

generally give leave to amend but may dismiss a complaint with prejudice where leave to amend

would be inequitable or futile.  See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482

F.3d 247, 252 (3d Cir. 2007) ("[I]n civil rights cases district courts must offer amendment—

---

Pollock relating to his visit pass).  See Fischer v. Transue, No. 04-cv-02756, 2008 WL 3981521,
at *10 (M.D. Pa. Aug. 22, 2008) (concluding that temporal proximity of twenty-two (22) days
was "too lengthy to give rise to an inference of causation"); see also Thomas v. Town of
Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (determining that temporal proximity of three (3)
weeks between employee's complaint and issuance of termination letter was not unduly
suggestive).  There are also no factual allegations describing a pattern of antagonism following
Mickens's protected conduct.

In addition, "[c]ourts have consistently rejected retaliation claims 'against one defendant based
on [protected activity] against another [individual]' for lack of retaliatory motive."  See
Muhammad v. Brown, No. 23-cv-00212, 2024 WL 3540991, at *3 (M.D. Pa. July 25, 2024)
(citations omitted); see also Royster v. Beard, 308 F. App'x 576, 579 (3d Cir. 2009)
(unpublished) (affirming summary judgment in favor of defendant on plaintiff's claim that he
was retaliated against by a defendant who was not the target of his protected activity).  It is
unclear from Mickens's allegations as to why Clark, who had only reviewed and rejected two (2)
of Mickens's grievances over a more-than-two-month period and was not the subject of any
grievance herself, would retaliate against him for filing grievances against two (2) of her
allegedly subordinate officers, Pollock and Taylor.  Even if the alleged reason was something
such as Mickens's appeals from her Initial Response denials, Clark appears to have moved
Mickens to a new cell away from the correctional officers that were allegedly harassing and
retaliating against him.  As such, it is also unclear how the move itself was a retaliatory act.

Finally, while Mickens alleges that his complaint to PPS was a reason for Defendants' alleged
retaliation, he avers no facts as to how they would have been aware of it.  To show that the
alleged retaliatory act was caused by protected conduct, "the actor 'responsible for the alleged
adverse actions' must have been aware of the conduct in question."  See Smallwood-Jones v.
Thomas Jefferson Univ. Hosps., Inc., No. 22-cv-03168, 2023 WL 1102333, at *4 (E.D. Pa. Jan.
30, 2023) (quoting Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007)); see also Hammond v.
City of Wilkes Barre, 628 F. App'x 806, 808 (3d Cir. 2015) (unpublished) (explaining that "we
have generally required that defendants in First Amendment retaliation actions be aware of the
protected conduct in order to establish the requisite causal connection," and concluding that "we
are not required to credit [the plaintiff's] bald assertion" that defendants "were aware of [his]
protected activities" (citing Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002))).

irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile."); see also Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) ("When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that [they have] leave to amend within a set period of time, unless amendment would be inequitable or futile.").  "In determining whether [amendment] would be futile, the district court applies the same standard of legal sufficiency as [it] applies under Fed. R. Civ. P. 12(b)(6)."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  Based on the analysis above, it would be futile for Mickens to file an amended complaint as to any claim other than his retaliation claim against Clark for transferring him to a new cell in August 2023.  It appears very unlikely that Mickens can include sufficient allegations in an amended complaint to assert a plausible retaliation claim against her because of the transfer, insofar as, inter alia, he did not include any allegations in his grievance that his new cell was in a less desirable condition or location than his prior cell, he attempted to have another inmate move into the new cell, and he did not include any allegations about the condition of his new cell in his original complaint.  Nevertheless, because the Court cannot definitively find that allowing him to amend this claim would be futile, he will receive leave to file an amended complaint as to only this First Amendment retaliation claim against Clark.

## IV.    CONCLUSION

For the reasons discussed above, the Court will grant the motion to dismiss and dismiss the complaint.  The Court's dismissal of Mickens's First Amendment claim against Clark based on his August 2023 cell transfer will be without prejudice to Mickens reasserting this claim in an

amended complaint, should he choose to do so.  The Court will not grant Mickens leave to replead any of his other claims in an amended complaint.  An appropriate Order follows.[16]


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[16]  The Order will provide additional information to Mickens about the filing of an amended complaint.