**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RASHAN MICKENS, | : | |
| Plaintiff | : | No. 1:24-cv-00190 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| SHARON CLARK, | : | |
| Defendant | : | |

**MEMORANDUM**

Currently before the Court is Defendant Sharon Clark ("Clark")'s motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss pro se Plaintiff Rashan Mickens ("Mickens")'s amended complaint in which he asserts a claim under 42 U.S.C. § 1983 against Clark for allegedly retaliating against him in violation of the First Amendment to the United States Constitution. Despite the Court providing Mickens with ample opportunities to file a response to Clark's motion, he has never filed a response to her motion despite the passage of approximately ten months since she filed her brief in support of her motion. For the reasons set forth below, the Court will dismiss Mickens's amended complaint with prejudice, deny Clark's Rule 12(b)(6) motion to dismiss as moot, and direct the Clerk of Court to close this case.

I.      **BACKGROUND**

A.      **Procedural History**

Mickens, a convicted and sentenced state prisoner, commenced this action by filing a complaint, an application for leave to proceed in forma pauperis ("IFP Application"), and a certified prisoner trust fund account statement, all of which the Clerk of Court docketed on February 1, 2024. (Doc. Nos. 1–3.) In his complaint, Mickens named as Defendants: (1) Clark, a Unit Manager at Pennsylvania State Correctional Institution Rockview ("SCI Rockview"); (2) Heather Haldeman ("Haldeman"), a Major of Unit Management at SCI Rockview; (3) A.J.

Taylor ("Taylor"), a Sergeant at SCI Rockview; and (4) R.G. Pollock, a Correctional Officer at SCI Rockview. See (Doc. No. 1 at 1–3). Mickens asserted causes of action under Section 1983 against Defendants in their official and individual capacities pertaining to events that allegedly occurred at SCI Rockview from May through August 2023. See (id. at 4–15). These claims included: (1) "us[ing] foul and vulgar language towards [him]" on May 17, 2023; (2) "intentionally thwarting [his] attendance at in-person visitation" on July 24, 2023; (3) retaliating against him in violation of the First Amendment to the United States Constitution; and (4) conspiring to violate his civil rights. See (id. at 4, 8, 12–15). For relief, Mickens sought monetary compensation as well as "disciplinary action against Defendants, including but not limited to, removal from current positions/posts." See (id. at 8).

On March 6, 2024, the Court issued an Order which, inter alia, granted the IFP Application and directed the Clerk of Court to send waiver of service forms to Defendants. See (Doc. No. 6 at 1–2). Defendants waived service (Doc. No. 9), and they later filed a motion to dismiss the complaint under Rule 12(b)(6) along with a supporting brief (Doc. Nos. 10, 11). After requesting and receiving an extension of time to file a response to the motion to dismiss (Doc. Nos. 15, 16), Mickens timely filed a brief in opposition to the motion (Doc. No. 17).

After screening Mickens's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and reviewing the parties' submissions on Defendants' Rule 12(b)(6) motion to dismiss, the Court issued a Memorandum and Order on March 31, 2025. (Doc. No. 18, 19.) In the Memorandum and Order, the Court, inter alia: (1) granted Defendants' motion to dismiss; (2) dismissed Mickens's claims against Haldeman, Pollock, and Taylor with prejudice; and (3) dismissed with prejudice Mickens's claims against Clark except to the extent that he alleged that she retaliated against him in violation of the First Amendment when she transferred him to a new cell in

August 2023, as the Court dismissed that claim without prejudice.  See (Doc. Nos. 18 at 13–42; 19 at 1–2).  The Court also provided Mickens with a period of thirty days to file an amended complaint.  See (Doc. No. 19 at 2).

Mickens timely filed an amended complaint against only Clark on April 29, 2025.  (Doc. No. 20.)  On May 13, 2025, Clark filed a Rule 12(b)(6) motion to dismiss Mickens's amended complaint (Doc. No. 22), and she filed a brief in support of her motion on May 27, 2025 (Doc. No. 23).  Mickens did not file a response in opposition to Clark's motion within the time set by the Court's Local Rules, i.e. by June 10, 2025.  See M.D. Pa. L.R. 7.6 ("Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . .  Any party who fails to comply with this rule shall be deemed not to oppose such motion."); see also M.D. Pa. L.R. 83.18 ("Service of any notices, copies of pleadings, motions or papers in the action at the address currently maintained on file in the clerk's office by a party shall be deemed to be effective service upon such party.").  Almost two months after the June 10, 2025 deadline, Mickens filed a "Motion for Leave to Amend Complaint and Request to Stay Complaint Pending the Exhaustion of Administrative Remedies."  See (Doc. No. 24).  Mickens never filed a brief in support of this motion as required by the Local Rules, see M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion. . . . If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."); consequently, the Court issued an Order on November 24, 2025, deeming Mickens's motion withdrawn due to his failure to file a supporting brief.  (Doc. No. 26.)

On December 2, 2025, Clark filed a motion seeking to have the Court issue an Order deeming her Rule 12(b)(6) motion unopposed due to Mickens's failure to file an opposition brief

or, alternatively, directing Mickens to show cause why the Court should not dismiss this action for failure to prosecute under Federal Rule of Civil Procedure 41(a). (Doc. No. 28.) Clark also filed a brief in support of her motion. (Doc. No. 29.) On December 9, 2025, the Court entered an Order denying Clark's motion, providing Mickens with a period of twenty-one days to file a response to Clark's Rule 12(b)(6) motion to dismiss, and admonishing him that if he failed to file a response, the Court would consider him to be unopposed to the Court granting Clark's motion to dismiss and determine whether dismissal of his amended complaint is warranted under Poulis v. State Farm Fire & Casualty Co., 747 F.2d 863 (3d Cir. 1984). See (Doc. No. 30).

On December 30, 2025, Mickens filed a motion for a sixty-day extension of time "to appeal or respond to their brief." See (Doc. No. 31 at 1). He asserted that, inter alia, he gets only two days per week at the law library and is not an attorney. See (id.). He also complained that his receipt of mail from Clark is delayed because her counsel sends his legal mail to the Commonwealth of Pennsylvania Department of Corrections ("DOC")'s third-party mail processing company, Smart Communications, instead of labeling the mail as "legal mail" and sending it directly to the prison. See (id.). Mickens further made a passing reference to wanting counsel to assist him in this case. See (id.).

On February 12, 2026, the Court issued an Order which denied without prejudice Mickens's passing reference to a request for counsel and denied his request for an order directing Clark to send documents directly to his place of confinement instead of to Smart Communications. See (Doc. No. 32 at 2–4). The Court also granted Mickens's motion for an extension of time to file a response in opposition to Clark's Rule 12(b)(6) motion to dismiss because he showed good cause for an extension generally. See (id. at 4). However, the Court denied Mickens's request for a sixty-day extension and instead extended the time for only

4

twenty-one days, i.e., until March 5, 2026.  See (id. at 4–5).  In doing so, the Court explained as

follows:

> Mickens has had almost seven months to file his response to Clark's Rule 12(b)(6) motion to dismiss and has yet to file a response.  The Court established a new deadline for Mickens to file a response to the motion only because Clark was seeking dismissal of this action for lack of prosecution and the applicable law required that Mickens receive notice before such a dismissal.  As the Court explained in denying Clark's request for issuance of an order to show cause why the Court should not dismiss the case for lack of prosecution under Rule 41(a):
>
>> To date, the Court has not ordered Mickens to respond to Clark's Rule 12(b)(6) motion; therefore, the Court cannot order him to show cause why the Court should not dismiss the action under Rule 41(a). In other words, he has not failed to do anything ordered by this Court with notice that his failure to act could result in the dismissal of this action for his failure to comply with Local Rule 7.6.  See Gary[ v. Pa. Human Rels. Comm'n , 497 F. App'x 223, 226 (3d Cir. 2012) (unpublished)] ("While we have said that 'some cases' could be dismissed as unopposed, 'particularly if the party is represented by an attorney,' or if the party failed to comply with a court's orders, that is not the situation here.  The District Court did not give Gary any notice that it was considering the sanction of dismissal for failure to comply with local procedure." (emphasis added)); see also Gentles v. Borough of Pottstown, No. 20-2738, 2023 WL 4993198, at *1 (3d Cir. Aug. 4, 2023) (unpublished) (indicating that the district court could address whether dismissal of a complaint is warranted if the district court directed the plaintiff "to address why the motion should not be granted as unopposed, and [the plaintiff does] not respond").
>
> Mickens does not explain anywhere in his motion why he has continuously failed to file a response to Clark's Rule 12(b)(6) motion to dismiss.  He cannot blame delays in his receipt of the mail for this lengthy failure, and this is the first time he has requested an extension of time to file a response. Therefore, the Court will provide him with an additional twenty-one-day period to file his response.

See (id. at 4–5 (quoting Doc. No. 30 at 4)).

In addition to the above, the Court admonished Mickens that if he did not file a timely

respond to Clark's motion, the Court would consider whether to grant Clark's motion as

5

unopposed.  See (id. at 5 (citations omitted)).  To date, Mickens has not filed a response to

Clark's motion, and the time for him to do so has long passed.

### B.      Allegations in the Amended Complaint

Although Mickens indicates in his amended complaint that his claim against Clark relates

to her decision to transfer him to a different cell on August 15, 2023, he again describes events

that allegedly occurred at SCI Rockview from April through August 2023.  See (Doc. No. 20 at

4, 5).  The Court summarizes those allegations below.

### 1.      April 2023

Mickens avers that in mid-April 2023, he observed "Clark's CB Housing 'Unit Team' of

[correctional officers] fail to timely respond to an inmate's medical emergency on CB Unit, then

act with indifference to his medical emergency once officers responded . . . ."  See (id. at 5, 11).

After observing this conduct by the officers, Mickens contacted the Pennsylvania Prison Society

("PPS") to report what he observed.[1]  See (id. at 5, 11).

### 2.      May 11–16, 2023

### a.      The May 11, 2023 Incident

On May 11, 2023, "after [correctional officers] were made aware of Mickens [sic] contact

with PPS, [he] personally heard the same [two correctional officers] involved in the medically

distressed inmate's death directing homophobic remarks and racial slurs toward [him]."  See (id.

at 5–6, 11).  Mickens then questioned the officers "about whether their homophobic and racal

[sic] slurs were specifically directed at [him]," but they ordered him to "return to his cell even

---

[1]  The PPS has been described "as an organization dedicated to advocating for prisoners, visiting prisoners, writing to prisoners, and listening to prisoners."  See Abney v. Younker, No. 13-cv-01418, 2018 WL 398323, at *11 (M.D. Pa. Jan. 12, 2018).

though being on the inmate telephone, where Mickens was at the time, was authorized for [his] cohort during that time." See (id. at 6, 20).

### b.    Mickens's Grievance

Based on this incident, Mickens filed a grievance (No. 1033722) on May 11, 2023. See (id. at 5–6, 11; Doc. No. 20-1 at 2). In this grievance, Mickens sought to have the correctional officers removed from the CB Unit "or have them both reprimanded for their insensitivity towards gays and African Americans." See (Doc. No. 20-1 at 2).

Grievance No. 1033722 was rejected on May 16, 2023, because it did not comply with the DOC's Inmate Grievance System (DC-ADM 804). See (Doc. Nos. 20 at 6, 11; 20-1 at 3). Mickens was informed that "allegations of a sexual nature (abuse/harassment) against a staff member . . . must be investigated to make sure that the inmates are safe in th[e] facility." See (Doc. Nos. 20 at 6, 11; 20-1 at 3). As such, the grievance was forwarded to SCI Rockview's security office and the Prison Rape Elimination Act ("PREA") Compliance Manager for purposes of an investigation. See (Doc. Nos. 20 at 6, 11; 20-1 at 3).

Mickens was later asked to withdraw his "claim," but he refused to withdraw it "due to the heinousness of the [correctional officers'] continued conduct." See (Doc. No. 20 at 6, 11). At no point thereafter was Mickens informed of any investigation into his "claim," and he asserts that this failure to notify him violated 28 C.F.R. § 115.73(a), (e). See (id. at 6, 11–12).

### c.    Misconduct Report

In addition to the events related to Grievance No. 1033722, Mickens alleges that he "was issued a frivolous 'unauthorized area' Class 1 misconduct by CB Unit Team [correctional officers] immediately after questioning them" on May 11, 2023. See (Doc. No. 20 at 20). He asserts that when he "expressed to the Hearing Examiner that he was in fact in an authorized area

(phone & kiosk for [his] cohort), the Hearing Examiner expressed that he believed Mickens," but removed him from his job as a block worker on CB Unit "in lieu of [a] cell restriction." See (id.).

### 3.   May 17, 2023 Incident

Following Mickens submitting Grievance No. 1033722, he experienced "a series of retaliatory action [sic] from CB Housing Unit Team [correctional officers] towards [him] which resulted in [his] filing of additional grievances . . . for [correctional officers'] misconduct and in an effort to deter the [correctional officers'] current and former misconduct towards him." See (id. at 6, 11). Clark was the "Unit Manager of CB Unit throughout Mickens'[s] perceived retaliation troubles with CB Unit Team [correctional officers.]" See (id. at 20).

The first incident occurred on May 17, 2023, when the same correctional officers who used homophobic and racial slurs "began exhibiting an unprovoked, unprofessional attitude towards Mickens by . . . screaming at [him]." See (id. at 6). At the time, Mickens was "using the toilet located at the front of his cell and had a 'curtain' partially obstructing [his] lower extremities while seated on the toilet as is customarily done by all inmates without consequence" to, inter alia, protect their personal privacy and prevent accusations of indecent exposure. See (id. at 6–7). Mickens points out that correctional officers "usually only complain about the temporarily hung additional 'unauthorized' curtain when an inmate is using the toilet if it fully obstructs [their] view into the cell," see (id. at 7), and his "torso was in full view of any [correctional officer] doing cell checks [or] walking by" his cell. See (id.). Yet, when the CB Unit correctional officer observed Mickens using the "curtain" to partially obstruct the view of his "lower extremities," he yelled, "[t]ake down your fu**ing [sic] tent, dickhead!" See (id. at 6).

Mickens filed a grievance (No. 1034316) relating to this incident, claiming that the correctional officer violated the DOC's Code of Ethics by using foul language and requesting that the officer be disciplined. See (id.; Doc. No. 20-2 at 2). Clark was the grievance officer assigned to this grievance, and she rejected it as frivolous on June 12, 2023. See (Doc. No. 20 at 7, 12; Doc. No. 20-2 at 3–4).

Clark described her investigation into the grievance, as well as her reasons for rejecting it, as follows:

> Mr. Mickens, I have read your grievance, reviewed the 5/17/2023 SCI Rockview Control Packet, reviewed the PA DOC Inmate Handbook 2017 Edition, reviewed the SCI Rockview Inmate Handbook Supplement, and interviewed CO1 Pollock. To summarize your issue, you claim on 5/17/2023, Officer Pollock stopped at your cell and yelled "Take down your fu[**]ing tent, dickhead"[]and walked away.
>
> The findings of this investigation include the following: Upon review of the PA D[OC] 2017 Inmate Handbook Section VIII.C.7 – Unless approved, nothing is to be affixed to the bars, vents, windows, beds/bunks, walls, or cell doors[,] and the SCI Rockview 2022 Inmate Handbook Supplement Section VIII.A.14 – Nothing may be fastened to the cell door, bars, beds, vent, cabinets, lights or window other than the approved privacy panel. On 5/17/2023, SCI Rockview was locked down and CO1 Pollock worked the 6-2 shift on CB Unit. Officer Pollock reported that there were many times throughout his shift that he had to stop at your cell to tell you to take down the unauthorized item(s) you had affixed to your bed/bunk because he couldn't see you. He states that he told you to take down the tent during each of his housing unit rounds; but denies yelling and using any foul or vulgar language when speaking to you.
>
> The result of this investigation concludes that based on the above information, if you would have removed the unauthorized item(s) affixed to your bed/bunk the first-time [sic] staff told you about it, the issue would have been resolved. But, because you chose to not remove the unauthorized item from you [sic] bed/bunk, Officer Pollock had to continue to readdress this issue with you throughout his shift. You are fortunate that you were not issue [sic] a misconduct due to your refusal to obey an order the first time Officer Pollock addressed this issue with you. Officer Pollock's version of the events is viewed to be more credible than yours. Therefore, this grievance is denied.
>
> No relief was requested in this grievance.
>
> . . .

9

This grievance has been found as being frivolous as your allegations lack any arguable basis in law, fact, and/or policy.

See (Doc. No. 20-2 at 3).

Mickens criticizes Clark's denial of his grievance because she allegedly did not interview any witnesses and "simply took the [correctional officer] at his word . . . that he did not use foul and vulgar profanity directed at [him]." See (Doc. No. 20 at 7). Mickens later appealed from this denial to the Facility Manager, which was denied on July 3, 2025. See (id.; Doc. No. 20-2 at 5). Mickens then filed an Inmate Appeal to Final Review with the DOC Secretary's Office of Inmate Grievances & Appeals ("SOIGA") on July 18, 2023, see (Doc. Nos. 20 at 7; 20-2 at 6), and SOIGA upheld the denial via a decision dated on August 30, 2023. See (Doc. Nos. 20 at 7; 20-2 at 7).

### 4.    July 24, 2023 Incident

On July 24, 2023, Mickens had an in-person contact visit with his family scheduled for 12:45 p.m. See (Doc. No. 20 at 7). Because the facility "count" occurs at 12:30 p.m., inmates are instructed to retrieve a pass from housing unit officers at 12:15 p.m. to report to the visitation room prior to the 12:30 count. See (id.). Once the 12:30 p.m. count occurs, inmate walkways close and inmate movement ceases. See (id.).

Mickens approached the CB Unit desk to obtain his visit pass at approximately 12:15 p.m., but correctional officers ordered him to return to his cell because they were not "doing visits." See (id.). Thereafter, no correctional officer called Mickens over for his pass prior to the 12:30 p.m. count. See (id.). Once "count cleared" at approximately 1:10 p.m. and the inmates' cell doors and walkways opened, Mickens approached the CB Unit desk again. See (id.). Mickens was asked why he was out of his cell, and Mickens responded that he told them that he had a visit scheduled. See (id.). The correctional officers responded to Mickens by stating that it

10

was not their "job to worry about [his] visit!" See (id.). Mickens was then given his pass to report to the visit room, but he was approximately forty-five minutes late even though his family drove for "hours" to see him. See (id.).

Once Mickens reported to the visit room, officers there asked him why he was late. See (id. at 8). Mickens described what occurred in the CB Unit, and the visit room officers informed him that they called CB Unit more than once to have Mickens sent for his visit prior to the 12:30 p.m. count. See (id.).

Following his visit, Mickens spoke to two other CB Unit inmates who also had 12:45 p.m. visits that day, and they told him that they did not have any issues retrieving their passes for their visits. See (id.). Three days later, Mickens submitted a grievance (No. 1044716) about the issues he encountered getting a pass for his visit. See (id.; Doc. No. 20-3 at 2–3). For relief, Mickens requested that the CB Unit correctional officers be removed from the unit and/or reprimanded, and he also requested $250,000 in monetary damages. See (Doc. No. 20-3 at 2–3).

On August 21, 2023, Clark issued an Initial Review Response in which she denied the grievance as frivolous. See (id. at 4; Doc. No. 20 at 8, 12). Clark explained her reasons for the denial as follows:

> Mr. Mickens, I have read your grievance, reviewed the Daily Roster for 6-2 shift for 7/25/2023, and interviewed CO1 R. Pollock and CO2 A. Taylor. To summarize your issue, you claim Sgt. Taylor and CO Pollock did not give you your pass for a visit before count 7/24/2023 and that staff made you late for your visit; but, other inmates were sent.
>
> The findings of this investigation include the following: Upon review of the 7/24/2023 Daily Roster, Sgt. Taylor and CO Pollock worked the 6-2 shift on CB Unit. Upon interviewing both staff separately, both informed me that the Visiting Schedule was posted on the housing unit on 7/24/2023. Both also informed me that you did not come to the Officers' Desk prior to the start of Noon Count that day to get your pass. However, you did come to the Officers' Desk after the Noon Count cleared and asked for your pass to go to your scheduled visit. You were given your

11

pass to go to your visit.  Both denied making any of the statements you claim they made in this grievance.

The result of this investigation concludes that you were late for your visit because you did not come up to the Officers' Desk prior to the start of Noon Count to get your pass.  When you came up to the Officer's Desk after the Noon Count cleared and asked for your pass to go to your visit, this tells me that you knew you had a visit scheduled.  Therefore, the Officers' version is viewed to be more credible than yours.  Therefore, this grievance is denied.

The request for relief sought to have Officer Pollock and Sgt. Taylor removed from the Housing Unit and/or reprimanded/disciplined and you be awarded monetary compensation not to exceed the statutory limit of $250,000 is denied.

. . .

The grievance has been found as being frivolous as your allegations lack any arguable basis in law, fact, and/or policy.

See (Doc. Nos. 20-3 at 4; 20 at 8, 12).

Mickens complains that Clark again allegedly failed to investigate his grievance.  See (Doc. No. 20 at 8).  In particular, he believes that Clark should have interviewed the visit room staff who told him that they contacted the CB Unit to have him sent for the visit prior to the 12:30 p.m. count.  See (id.).  He also criticizes Clark's decision to allegedly interview only the CB Unit correctional officers and accept their version about what happened.  See (id.).

After Clark's denial of Grievance No. 1044716, Mickens appealed to the facility manager, who affirmed her denial via a decision issued on September 11, 2023.  See (id. at 8; Doc. No. 20-3 at 5–6).  Mickens then filed a final appeal to SOIGA, which also affirmed Clark's denial via a decision issued on October 24, 2023.  See (Doc. Nos. 20 at 8; 20-3 at 7–8).

### 5.    August 15, 2023 Incident

#### a.    The Incident

While Mickens's appeals relating to Grievance Nos. 1034316 and 1044716 were pending, Clark "abruptly moved [him] from his cell on CB Unit to a less desirable cell/location on CA

12

Unit," which Clark also managed.  See (Doc. No. 20 at 8, 12).  Although Clark moved Mickens, she did not move his cellmate in CB Unit, with whom Mickens had a prior Voluntary Cell Agreement ("VCA").  See (id. at 8).

Mickens views his move to CA Unit as an act of retaliation by Clark.  See (id. at 8, 12). He alleges that his view was confirmed when he "inquired about why he was moved[,] and a CA Unit [correctional officer] informed him that he was moved because of his grievances against [correctional officers] and his complaining to the PPS."  See (id. at 8, 12).  He also spoke to Clark about the move on August 16, 2023, and she told him that she could do what she wants to do as a Unit Manager.  See (id. at 8–9, 12).

Mickens avers that he attempted to "make the new living quarters more comfortable despite the conditions" because he recognized that he "had no other option under [DOC] policy but to adapt to the forced move or face a misconduct charge that includes pre-hearing confinement in the Restricted Housing Unit if he failed to follow the direct order to move."  See (id. at 8, 17).  As such, he entered into a new VCA with another inmate, which was approved by the block sergeant for the CA Unit.  See (id. at 8).  However, Clark, who had final approval over the VCA, ignored it and moved a different inmate into Mickens's CA Unit cell.  See (id. at 9, 12).

### b.    Mickens's Cell in CA Unit

As for his new cell in CA Unit, Mickens alleges that despite his move from CB Unit, he was "in continued direct contact with the same [correctional officers] on CA Unit as on CB Unit."  See (id. at 13).  He was therefore in a unit which Clark managed and was "partially overseen by the same [correctional officers] who are part of the CB Unit Management Team

where the [correctional officers] alternate on a daily basis as 'Rovers' between CA and CB units doing cell checks about every 15 minutes." See (id. at 14).

There were several differences between CB Unit and CA Unit, which Mickens describes as follows:

> CB Unit is viewed by General Population (GP) Inmates as the unofficial "honor unit" of [SCI] Rockview. This reasoning stems from the fact that official honor units within [SCI] Rockview house only Custody Level (CL) 2 inmates, a custody level for non-violent inmates who demonstrate the least security risk. (CL 2 is the lowest security risk level achievable within the fenced compound; Life sentenced prisoners are also classified to CL2 units, but only after, inter alia [sic], 15 years of continued incarceration and prison "staffing." **See 11.2.1 Reception and Classification Procedures Manual Confidential Section 3.J.** – this section is not available for inmates or for public dissemination so Mickens is unaware of its official content.) CB Unit houses CL 3 and 4 GP inmates in addition to CL 2 inmates, yet is the only GP housing unit in Rockview that does not have a cage or locking doors on the [correctional officers'] office, or "bubble" as it is commonly referred to. Inmates housed there, although of CL 2, 3 and someties [sic] 4, have been classified there due to low risk of violence towards staff members and/or lower risk of violence towards other inmates. CB's bubble is completely open on all three exposed sides with a knee[-]high open faced desk where inmates, inter alia [sic], retrieve passes and has a non-locking waist high spring actuated staff entrance. The CB bubble is located at the front of the unit without a direct line-of-sight to the dogleg rear section of the unit. UM Clark's office is also located on CB directly behind the . . . bubble, as is the copier/printer where staff print, inter alia [sic], count sheets for both CA and CB units and all block supplies such as cleaning chemicals, are stored there. Additionally, CB Unit cell doors remain unlocked during normal operations with the exception of count time and evening locks at 2050 hrs.
>
> By contrast, CA Unit has a full steel mesh construction bubble with thick plexi-glass windows and steel mesh ceiling along with a slide-latch padlocked staff entrance. CA's bubble is centrally positioned on the dogleg of the unit where [correctional officers] have a full 360[-]degree line-of-sight view of all the ranges. CA houses custody level 2, 3, and 4 inmates including those with a violent history towards staff and other inmates. UM Clark does not have an office on CA. There is not a printer/copier on CA, and only block supplies that will be distributed immediately go to CA Unit, or are kept in the locked bubble. In other words, being classified to CA Unit is less desirable to inmates such as Mickens than a classification to CB Unit.

See (id. at 15–16).

14

Regarding his situation inside his new cell, Mickens alleges that he "was initially placed in the CA Unit cell with a 60 some [sic] year old [sic]sex offender convicted of rape and [who] also suffered from a medical condition that caused him to frequently urinate on himself and, at times, defecate on himself." See (id. at 16). As a result, [t]he cell reaked of urine and was extremely dirty." See (id.). Mickens asserts that forcing an inmate into a cell with a sex offender is "a common threat directed at inmates by [correctional officers] when they dislike the inmate or the [officers] perceive the inmate as problematic[] ([o]r, at times, when the [officers] want the sex offender himself to fear for his safety by placing a violent inmate in the cell." See (id.). In addition, Mickens "previously expressed his desire not to be celled with sex offenders." See (id. at 17).

Along with Mickens's issues with his initial cellmate, he alleges that his cell had "missing glass panes in the window." See (id. at 18). Due to this issue, Mickens and his cellmate "were temporarily moved to accommodate the repair, then moved back." See (id.). In addition, the cell had preexisting "heating issues" which Mickens learned of in late September 2023 once SCI Rockview's steam heat was activated, and which caused Mickens's cell to lack heat. See (id.). Moreover, the toilet in Mickens's cell leaked water onto the floor and it was not completely repaired despite the maintenance department performing work on the toilet after he was able to get a work order issued. See (id.).

Mickens alleges that he did not grieve about the issues with the conditions of his cell because Clark would be the grievance officer initially reviewing his grievance, and she treated his prior grievances as frivolous. See (id.). He was concerned that he could be placed on a grievance restriction, which can be imposed if an inmate submits five grievances within a thirty-

day period that are determined to be frivolous.  See (id.).[2]  Thus, he focused his attention on grieving Clark's alleged retaliation instead.  See (id.).

### c.      Mickens's Grievance

Mickens filed a grievance (No. 1049255) about his move to the CA Unit and Clark's failure to honor his new VCA on August 24, 2023.  See (id. at 9).  He sought monetary compensation, a directive requiring Clark to honor his VCA, an order preventing him from being moved from "C Unit" in retaliation, and the issuance of a reprimand to Clark or the imposition of discipline against her.  See (Doc. No. 20-4 at 2–3).

Haldeman issued an Initial Review Response denying Mickens's grievance as frivolous on September 14, 2023.  See (id. at 4; Doc. No. 20 at 9).  Haldeman detailed his reasons for denying the grievance as follows:

> Mr. Mickens, I have read your grievance and interviewed Unit Manager Clark about this grievance.  To summarize your issue, you claim that UM Clark moved you from CB Unit to CA Unit in retaliation for grievances you filed against CB Unit Officers, as well as, direct communication with the PA Prison Society concerning the officers.  You claim you asked UM Clark on 8/16/2023 why she moved you.  You allege she replied: "I'm a Unit Manager, I can do what I want to do."  As relief, Inmate Mickens request [sic] monetary compensation not to exceed the statutory limit of $250,000.00, UM Clark honor [sic] cell agreements, comply with policy, not move inmates off of C Unit in retaliation, and UM Clark to be reprimanded and/or disciplined.
>
> The findings of this investigation include the following: On 8/15/2023, you were moved from CB Unit to CA Unit due to safety/security reasons by UM Clark.  Upon interviewing UM Clark, she does not recall speaking with you on 8/16/2023, and denies making the statements you claim she said to you.  She also does not recall receiving a Voluntary Cell Agreement Form from you, and denies placing another inmate in the cell with you.  The results of this investigation conclude that cell assignment is based on staff evaluation.  Your preferences will be assessed by staff, but not necessarily granted.  Staff initiated cell changes for safety or security reasons may occur at any time with the Unit Manager or the Shift Commander, or their designees.  There is no evidence in the above investigation to support your

---

[2]  It is unclear why Mickens would fear a grievance restriction considering he only mentions three grievances (only two of which were determined to be frivolous) over several months.

16

claim against UM Clark.  This is a "he said she said" situation.  I am unable to substantiate your claims that UM Clark violated any PA DOC Policies and/or PA DOC Code of Ethics.  UM Clark's version is viewed to be more credible than your version.  Based on the above information the grievance and requested reliefs are denied.

See (Doc. Nos. 20-4 at 4; 20 at 9).

Mickens criticizes Haldeman's Initial Review Response because he allegedly "simply [took] Clark at her word that she 'can do what [she] want[s] to do.'"  See (Doc. No. 20 at 9).  Additionally, Haldeman did not "specify what the alleged safety or security issues were that prompted the move nor why it was only Mickens and not his cellmate also being moved."  See (id. at 9, 14–15).  Mickens further asserts that Clark falsely indicated that she did not receive his new VCA, that she moved him for safety or security reasons, that she did not talk to him on August 16, 2023, and that she did not tell him that she could do what she wanted because she was the Unit Manager.  See (id. at 12–13).

Mickens appealed from Haldeman's decision to the facility manager, who upheld the denial via a decision issued on October 3, 2023.  See (Doc. No. 20-4 at 5–6).  Following the facility manager's decision, Mickens submitted a final appeal to SOIGA, which also upheld the denial through a decision issued on November 15, 2023.  See (id. at 7–8).

### 6.    Legal Claim and Requests for Relief

Based on these allegations, Mickens asserts a Section 1983 First Amendment retaliation claim against Clark in her individual capacity based on her decision to move him to a cell on CA Unit allegedly in response to Mickens filing grievances against her CB Unit Team correctional officers.  See (id. at 11–22).  For relief, he seeks nominal damages, punitive damages, and "the costs associated with preparing and filing of the instant Section 1983 Complaint throughout the history of the case."  See (id. at 23).

17

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss Under Rule 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. See Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 312 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible. See id. The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under <u>Twombly</u> and <u>Iqbal</u>, the Third Circuit Court of Appeals has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." <u>See</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 679). When following these steps, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." <u>See</u> <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed." <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>Higgs v. Att'y Gen.</u>, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe [their] complaint liberally" (citation and internal quotation marks omitted)). Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting <u>Estelle</u>, 429 U.S. at 106). This means the Court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" <u>See</u> <u>Vogt v. Wetzel</u>, 8 F.4th 182, 185 (3d Cir. 2021) (quoting <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 244–45 (3d Cir. 2013))). Moreover, when construing a pro se complaint, the court will "apply the relevant legal principle even when the complaint has failed to name it." <u>See</u> <u>Mala</u>, 704 F.3d at 244. However,

19

pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).

B.    Involuntary Dismissals

Federal Rule of Civil Procedure 41(b) allows for the dismissal of an action for failure of a plaintiff "to prosecute or to comply with these rules or a court order[.]" See Fed. R. Civ. P. 41(b).  District courts also have the inherent power to dismiss an action sua sponte for failure to prosecute.  See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991); see also R & C Oilfield Servs. LLC v. Am. Wind Transp. Grp. LLC, 45 F.4th 655, 661 (3d Cir. 2022) (stating that "[c]ourts possess inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" and that "[t]his includes the authority to dismiss a case for lack of prosecution" (citation, internal citation, and internal quotation marks omitted)).

When determining whether to dismiss an action with prejudice for a plaintiff's failure to prosecute under Rule 41(b), the Court considers and balances the following six (6) factors set forth by the Third Circuit Court of Appeals in Poulis:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

See 747 F.2d at 868–70; see also Spain v. Gallegos, 26 F.3d 439, 454–55 (3d Cir. 1994) ("Ordinarily, when a court is determining sua sponte or upon motion of a defendant whether to dismiss because of a plaintiff's failure to prosecute" the court must consider the Poulis factors). However, no single factor is dispositive, and not all factors must be satisfied for the Court to dismiss an action.  See Mindek v. Rigatti, 964 F.2d 1369, 1373 (3d Cir. 1992); Briscoe v. Klaus, 538 F.3d 252, 263 (3d Cir. 2008) (stating that "we have also made it clear that 'not all of the

20

<u>Poulis</u> factors need be satisfied in order to dismiss a complaint'" (quoting <u>Mindek</u>, 964 F.2d at 1373)).  Nevertheless, because "'dismissals with prejudice . . . are drastic sanctions' . . . it is imperative that the District Court have a full understanding of the surrounding facts and circumstances pertinent to the <u>Poulis</u> factors before it undertakes its analysis."  <u>See</u> <u>Briscoe</u>, 538 F.3d at 258 (quoting <u>Poulis</u>, 747 F.2d at 867–68).

> **C.        Dismissing Actions When a Plaintiff Fails to File a Response to a Rule 12(b)(6) Motion to Dismiss**

Local Rule 7.6 provides that a plaintiff must file a response to a defendant's Rule 12(b)(6) motion to dismiss within fourteen days after service of the moving defendant's brief in support of the motion.  <u>See</u> M.D. Pa. L.R. 7.6 ("Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . .").  They also provide that the Court will deem a plaintiff to be unopposed to the Court granting the Rule 12(b)(6) motion if they fail to timely respond to the motion.  <u>See</u> <u>id.</u> ("Any party who fails to comply with this rule shall be deemed not to oppose such motion.").

Despite the express language of this Local Rule, the Third Circuit Court of Appeals in <u>Stackhouse v. Mazurkiewicz</u>, 951 F.2d 29 (3d Cir. 1991), established certain guideposts for district courts before granting Rule 12(b)(6) motions as unopposed pursuant to a Local Rule.  In <u>Stackhouse</u>, the Third Circuit held that district courts generally should not dismiss an action "solely on the basis of [a] local rule without any analysis of whether the [operative] complaint failed to state a claim upon which relief can be granted, as provided in [Rule] 12(b)(6)," because "the case is simply not being dismissed because the [operative] complaint has failed to state a claim upon which relief may be granted.  Rather, it is dismissed as a sanction for failure to comply with the local court rule."  <u>See</u> 951 F.2d at 30 (citing <u>Anchorage Assocs. v. V.I. Bd. of</u>

21

Tax. Rev., 922 F.2d 168, 174 (3d Cir. 1990)); see also Cammarano v. Weaver, No. 25-cv-02117, 2026 WL 27561, at *2 (E.D. Pa. Jan. 5, 2026) ("[G]ranting a defendant's motion to dismiss a case where the plaintiff has failed to respond thereto is effectively akin to sanctioning the plaintiff for failing to comply with a local rule or court order." (citing Stackhouse, 951 F.2d at 29–30)).  However, in articulating this holding, the Third Circuit emphasized that "our holding is not broad" and did "not suggest that the district court may never rely on the local rule to treat a motion to dismiss as unopposed and subject to a dismissal without a merits analysis."  See Stackhouse, 951 F.2d at 30.  Instead, the Third Circuit explained that:

> There may be some cases where the failure of a party to oppose a motion will indicate that the motion is in fact not opposed, particularly if the party is represented by an attorney and in that situation the rule may be appropriately invoked.  Nor do we suggest that if a party fails to comply with the rule after a specific direction to comply from the court, the rule cannot be invoked.

See id.

Following Stackhouse, the Third Circuit has repeatedly stated that district courts should generally not dismiss actions based solely on a local rule in circumstances where the plaintiff failed to respond to a Rule 12(b)(6) motion to dismiss.  See, e.g., Regaolo v. Target Corp., No. 25-2514, 2026 WL 280891, at *1 (3d Cir. Feb. 3, 2026) (unpublished) (concluding that the district court "abused its discretion" in dismissing the pro se plaintiff's complaint for failing to oppose the defendant's Rule 12(b)(6) motion); Brzozowski v. Pa. Tpk. Comm'n, 738 F. App'x 731, 734 (3d Cir. 2018) (unpublished) (determining that the district court erred in granting defendants' Rule 12(b)(6) motion to dismiss the plaintiff's amended complaint as unopposed); cf. Washington v. Wenerowicz, No. 21-2741, 2022 WL 39870, at *2 n.5 (3d Cir. Jan. 5, 2022) (unpublished) ("To the extent that the District Court may have granted the Medical Defendants' motion to dismiss as unopposed pursuant to [Eastern District of Pennsylvania Local Rule 7.1(c)],

22

based on Washington's failure to file a response, this would likely be improper."). Because "[a]

dismissal of this kind is 'a sanction for failure to comply with the local court rule,'" district

courts "generally must consider the relevant factors set forth in [Poulis]" before taking "the

drastic step of dismissing a complaint as a sanction." See Regaolo, 2026 WL 280891, at *1

(quoting Stackhouse, 951 F.2d at 30). Nevertheless, "[t]here are exceptions to these principles[,]

such as when a counseled party truly does not oppose a motion, when a party fails to comply

with a rule despite a specific directive to do so, or when a party's conduct makes adjudication of

the case impossible . . . ." See id. at *1 n.2 (citations omitted).

### D.      Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for

violations of federal constitutional rights committed by state officials. See 42 U.S.C. § 1983.

This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

See id. "Section 1983 is not a source of substantive rights," but is merely a means through which

"to vindicate violations of federal law committed by state actors." See Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S.

273, 284–85 (2002)). "To state a claim under § 1983, a plaintiff must allege the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." West v. Atkins, 487

U.S. 42, 48 (1988).

23

### E.    First Amendment Retaliation Claims

To plead a prima facie First Amendment retaliation claim, a plaintiff must allege that: "(1) [their] conduct was constitutionally protected; (2) [they] suffered an adverse action at the hands of prison officials; and (3) [their] constitutionally protected conduct was a substantial or motivating factor in the decision to discipline [them]." See Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (citations omitted). As for the first element of a plaintiff's prima facie case, the filing of lawsuits and prison grievances constitutes activity protected by the First Amendment. See id. (reiterating prior holding that a prisoner-plaintiff engages in constitutionally protected activity when they file a grievance against a prison official (citing Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003))); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (acknowledging its prior holding "that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts" (citation omitted)); Allah v. Seiverling, 229 F.3d 220, 223–25 (3d Cir. 2000) (concluding that the prisoner-plaintiff stated a First Amendment retaliation claim where he alleged that he had been kept in administrative segregation in retaliation for filing civil rights claims against prison officials).

Regarding the second element of a plaintiff's prima facie case, an adverse action is one that is "sufficient to deter a person of ordinary firmness from exercising [their] [constitutional] rights[.]" See Mitchell, 318 F.3d at 530 (second alteration in original) (citations and internal quotation marks omitted); Fantone v. Latini, 780 F.3d 184, 191 (3d Cir. 2015), as amended (Mar. 24, 2015) (explaining that an adverse action must be "sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights . . ." (citation omitted)). However, to be actionable under Section 1983, the alleged adverse action must be more than de minimis. See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (explaining that the alleged retaliatory conduct

24

"need not be great in order to be actionable, but it must be more than de minimis" (citations and internal quotation marks omitted)).

And, finally, with respect to the third element of a plaintiff's prima facie case, the Court observes that, "[b]ecause motivation is almost never subject to proof by direct evidence," a plaintiff must typically "rely on circumstantial evidence to prove a retaliatory motive." See Watson, 834 F.3d at 422. The plaintiff "can satisfy [their] burden with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." See id. (footnote omitted).

## III. DISCUSSION

As noted supra, Mickens has not responded to Clark's Rule 12(b)(6) motion to dismiss, despite the Court expressly directing that he do so on two occasions and warning him on the latter occasion that if he did not file a response, the Court would consider dismissing this action due to his failure to file a response in accordance with Local Rule 7.6. See (Doc. Nos. 30, 32). Since the Third Circuit apparently would not permit this Court to dismiss this action even under these circumstances, see Brzozowski, 738 F. App'x at 734 (explaining that, inter alia: (1) before dismissing the plaintiff's operative complaint, the district court directed him to respond to the motion, warned him that dismissal was possible if he failed to respond, and the plaintiff failed to respond; (2) "[t]hese considerations [were] relevant to some of the Poulis factors" but did "not warrant dismissal by themselves"; and (3) "before dismissing an action as a sanction sua sponte, the District Court should provide the plaintiff with an opportunity to explain his reason for failing to . . . comply with its orders" (citation and internal quotation marks omitted)), the Court will analyze whether dismissal is appropriate under the Poulis factors. As explained below, the

Court concludes that dismissing this action with prejudice is warranted after considering the Poulis factors.

### A.      The Party's Personal Responsibility

The first factor is the extent of the party's personal responsibility.  Here, Mickens is personally responsible for his failure to respond to Clark's Rule 12(b)(6) motion and this Court's February 12, 2026 Order, as well as to prosecute this case generally.  Mickens is prosecuting this matter in a pro se capacity and has no one else to blame for his failure to act in this case.  See Briscoe, 538 F.3d at 258–59 ("[I]t is logical to hold a pro se plaintiff personally responsible for delays in [their] case because a pro se plaintiff is solely responsible for the progress of [their] case . . . ."); see also Clarke v. Nicholson, 153 F. App'x 69, 73 (3d Cir. 2005) (unpublished) ("[U]nlike a situation where dismissal is predicated upon an attorney's error, the plaintiff here was pro se and directly responsible for her actions and inaction in the litigation.").  Therefore, since Mickens is personally responsible for failing to prosecute this case, had approximately ten months to file a response to Clark's motion, and had notice that he risked dismissal of this case if he failed to respond to Clark's motion, this first factor weighs in favor of dismissal.

### B.      Extent of Prejudice to the Defendant

The second factor is the extent of prejudice to Clark by Mickens's failure to prosecute by filing a response to her Rule 12(b)(6) motion to dismiss.  "Generally, prejudice includes the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party."  Briscoe, 538 F.3d at 259 (citation and internal quotation marks omitted).  However, prejudice "is not limited to irremediable or irreparable harm.  It also includes the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy."  See id. (citations and internal

26

quotation marks omitted).  For example, prejudice can "include the burden that a party must bear when forced to file motions in response to the strategic discovery tactics of an adversary[.]"  See Ware v. Rodale Press, Inc., 322 F.3d 218, 223 (3d Cir. 2003) (citation omitted); see also Poulis, 747 F.2d at 868 (concluding that the district court's finding of prejudice to the defendant was "supported by the record" where "[t]he interrogatories were never answered nor were objections filed[, and] defense counsel was obliged to file a motion to compel answers, and was obliged to file its pretrial statement without the opportunity to review plaintiffs' pretrial statement which was due to be filed first").

Here, this factor weighs against dismissal.  "At this point, the Defendants' motion to dismiss is still pending, and as far as the Court is aware, no further action has been taken by the Defendants and no further costs incurred."  Cleary v. Atria Mgmt. Co., LLC, No. 15-cv-02779, 2015 WL 4770913, at *2 (E.D. Pa. Aug. 13, 2015) (citing Deen–Mitchell v. Lappin, 514 F. App'x 81, 87 (3d Cir. 2013) (unpublished)); see Deen-Mitchell, 514 F. App'x at 87 ( "[W]e cannot determine how the proposed defendants have been prejudiced because the case did not have the opportunity to proceed to discovery and because [the plaintiff]'s complaint gives adequate notice of his claims.").

### C.    The Plaintiff's History of Dilatoriness

The third factor is whether Mickens has a history of dilatoriness, which can be shown where there has been "extensive or repeated delay or delinquency . . . such as consistent non-response to interrogatories, or consistent tardiness in complying with court orders."  See Adams v. Trustees of N.J. Brewery Emps.' Pension Tr. Fund, 29 F.3d 863, 873–74 (3d Cir. 1994).  In this case, Mickens has demonstrated a history of dilatoriness.  Over the course of approximately ten months, Mickens has continually failed to file a response to Clark's Rule 12(b)(6) motion to

dismiss.  After approximately two months after his response to Clark's motion was due, he filed a motion seeking leave to file a second amended complaint (Doc. No. 24), but the Court deemed it withdrawn because he never filed a brief in support of his motion within fourteen days of filing it as required by the Local Rules (Doc. No. 26).  In early November 2025, Mickens filed a notice of change of address.  Since December 9, 2025, Mickens has failed to comply with two deadlines for him to file his response to Clark's Rule 12(b)(6) motion to dismiss, despite the Court extending the time for him to do so.  See (Doc. Nos. 29–32).

At this point, Clark's Rule 12(b)(6) motion to dismiss has been pending for almost ten months, and even though the Court has provided Mickens more than enough time to file a response, he has yet to respond or otherwise contact the Court to explain his dilatoriness.  The Court also warned Mickens that his failure to timely respond to Clark's Rule 12(b)(6) motion to dismiss could subject his amended complaint to immediate dismissal, and he still did not respond.  Accordingly, this factor weighs in favor of dismissal.

### D.    Whether the Plaintiff's Conduct Was Willful or in Bad Faith

The fourth factor is whether Mickens's conduct was willful or in bad faith.  In evaluating this factor, the Court must determine whether the conduct at issue reflects mere inadvertence or negligence, or conversely, whether it is "the type of willful or contumacious behavior which [can be] characterized as 'flagrant bad faith.'"  See Scarborough v. Eubanks, 747 F.2d 871, 875 (3d Cir. 1984) (citing Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976)); see also Beaver Res. Corp. v. Brawand, 618 F. App'x 736, 739 (3d Cir. 2015) (unpublished) ("Willfulness and bad faith go beyond mere negligence and involve intentional or self-serving behavior.").  Here, Mickens has not complied with two direct Court orders and an extension

period.  His decision to ignore the Court's directions, "even after express warnings about the consequences, can only be regarded as willful."  See Beaver Res. Corp., 618 F. App'x at 739.

### E.   The Effectiveness of Sanctions Other Than Dismissal

The fifth factor is the effectiveness of sanctions other than dismissal.  "[S]anctions less than dismissal [are] ineffective when a litigant . . . is proceeding pro se and in forma pauperis." Lopez v. Cousins, 435 F. App'x 113, 116 (3d Cir. 2011) (unpublished) (citing Briscoe, 538 F.3d at 262–63); see also Briscoe, 538 F.3d at 262–63 ("[W]here a plaintiff is proceeding pro se, and moreover, is proceeding in forma pauperis, we have upheld the District Court's conclusion that no alternative sanctions existed because monetary sanctions, including attorney's fees, 'would not be an effective alternative.'" (quoting Emerson v. Thiel Coll., 296 F.3d 184, 191 (3d Cir. 2002))).  Here, Mickens is proceeding pro se and in forma pauperis (Doc. No. 17), so the threat of monetary compliance (including fines, costs, or payment of attorney's fees) is unlikely to prompt compliance.  Therefore, this factor weighs in favor of dismissal.

### F.   The Meritoriousness of the Claim

The sixth and final factor is the meritoriousness of Mickens's First Amendment retaliation claim against Clark in his amended complaint.[3]  The standard for meritoriousness is whether the allegations in Mickens's amended complaint, "if established at trial, would support

---

[3]  In her Rule 12(b)(6) motion to dismiss, Clark argues that the Court should dismiss Mickens's First Amendment claim against her to the extent that he asserts that she retaliated against him by denying two of his grievances.  See (Doc. No. 23 at 9–12).  Although Mickens mentions those grievances in his amended complaint and criticizes Clark's decisions regarding the grievances, see (Doc. No. 20 at 6–8), the Court will not construe the amended complaint as also containing a First Amendment claim against Clark based on the denial of his grievances because the Court previously dismissed this claim with prejudice insofar as it was insufficient to show her personal involvement in any constitutional violation.  See (Doc. Nos. 18 at 19, 42; 19 at 2).

29

[his] recovery or . . . would constitute a complete defense." See Poulis, 747 F.2d at 870. As explained below, Mickens has not pleaded a potentially meritorious retaliation claim against Clark based on his cell reassignment.

In previously dismissing Mickens's First Amendment retaliation claim against Clark based on his cell reassignment in his original complaint, the Court explained as follows:

Under certain factual circumstances, an inmate's transfer to a different cell can constitute adverse action for purposes of a First Amendment retaliation claim. See Lawson v. Crowther, No. 17-cv-00039, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) ("Whether a [cell] transfer [constitutes adverse action] 'will depend on the facts of the particular case.'" (quoting Allah, 229 F.3d at 225)), report and recommendation adopted, 2018 WL 6523185 (W.D. Pa. Dec. 12, 2018). These factual circumstances include, inter alia (1) placement in lockdown and transfer to restrictive housing, administrative confinement, or disciplinary confinement, see Palmore v. Hornberger, 813 F. App'x 68, 70 (3d Cir. 2020) (unpublished) (explaining that "being placed in lockdown [and] being moved to restricted housing . . . are more than 'de minimis' adverse actions" (citation omitted)); Lawson, 2018 WL 6524380, at *3 (indicating that "a transfer into administrative or restrictive confinement . . . might represent an adverse action"); Dunbar v. Barone, 487 F. App'x 721, 723 (3d Cir. 2012) (unpublished) (stating that "placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs" was "sufficient to establish adversity"); (2) transfer into a cell with a cellmate whom prison authorities knew previously threatened to kill the prisoner-plaintiff, see Rinaldi v. United States, 904 F.3d 257, 269 (3d Cir. 2018); (3) transfer into a "dangerous cell block," see Lawson, 2018 WL 6524380, at *3; (4) transfer into "undesirable cells," see Molina v. Rivello, No. 23-cv-01111, 2023 WL 8359951, at *1, 4 (M.D. Pa. Dec. 1, 2023) (determining that the prisoner-plaintiff's allegations that the defendants retaliated against him by "plac[ing] him in cells 'contaminated with mold, rush, asbestos, and corrosion'" and "a cell with a leaking, broken toilet" were sufficient to satisfy adverse action requirement of prima facie retaliation claim); Griffin v. Malisko, No. 18-cv-01155, 2018 WL 5437743, at *3 (M.D. Pa. Oct. 29, 2018) ("[C]ell transfers to undesirable areas of a prison could have a strong deterrent effect."); (5) transfer of an immunocompromised inmate into a cell with a sick inmate, see Chruby v. Bearjar, No. 17-cv-01631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018), report and recommendation adopted, 2018 WL 4507599 (M.D. Pa. Sept. 19, 2018), aff'd, No. 24-1200, 2025 WL 325751 (3d Cir. Jan. 29, 2025); and (6) transfer from a single cell into a double cell, see Montanez v. Keller, No. 13-cv-02564, 2015 WL 273199, at *4 (M.D. Pa. Jan. 20, 2015), report and recommendation adopted, 2015 WL 3604058 (M.D. Pa. June 5, 2015). "In such cases, the cell transfers 'have a strong deterrent effect.'" Roman v. County of Chester, No. 23-cv-01662, 2024 WL

30

4844792, at *12 (E.D. Pa. Nov. 20, 2024) (quoting Dillard v. Talamantes, No. 15-cv-00974, 2018 WL 1518565, at *11 (M.D. Pa. Mar. 28, 2018)).

On the other hand, courts have declined to find sufficient adversity caused by, inter alia, the following factual circumstances: (1) "transfer from one cellblock to another similar cellblock," Griffin, 2018 WL 5437743, at *3; (2) transfer "to a different cell, and failing to allow [the prisoner-plaintiff] to cell with the inmate of [their] choice in a cleaner, quieter cell," see Dillard, 2018 WL 1518565, at *11; (3) transfer to a cell with a faulty shower, see Owens, 629 F. App'x at 167 ("Owens' mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet the[] elements [of a First Amendment retaliation claim.]"); (4) transfer to an equivalent cell over a short period of time, see Lawson, 2018 WL 6524380, at *3 ("While transferring between equivalent cells within a short period of time may have been an annoyance, the Court cannot conclude that it would deter a person of ordinary firmness from exercising [their] constitutional rights."); (5) transfer to a "less desirous cell" where the prisoner-plaintiff "did not demonstrate that the living conditions [the prisoner] endured constituted an adverse action," see Verbanik v. Harlow, 512 F. App'x 120, 122 (3d Cir. 2013) (unpublished); see also Walker v. Sellers, No. 21-cv-00660, 2024 WL 943448, at *3 (E.D. Pa. Mar. 5, 2024) ("On its own, a movement from one cell to another where there is no pled material difference would not survive a motion to dismiss . . . ."); and (6) transfer from a double-bunk cell to another double-bunk cell in the same cell block, see Griffin v. Williams, No. 10-cv-02472, 2011 WL 3501787, at *6–7 (M.D. Pa. Aug. 10, 2011).  Essentially, courts have found these factual circumstances to be de minimis because they would not deter a person of ordinary firmness from exercising their constitutional rights.

In this case, Mickens's factual allegations fall into the de minimis category.  He alleges that he was moved to a different cell in a different unit of the prison.  He does not allege that this cell transfer resulted in a less favorable placement in the prison or the loss of any privileges.  He also does not allege that the cell itself was different insofar as he appears to have moved from a double cell into another double cell.  His only complaint about his new cell appears to be that he did not get to pick his cellmate; however, despite Mickens stating in his grievance that Clark's alleged failure to honor his cell agreement violated prison policy, see (Doc. No. 1-4 at 3), he acknowledges that the policy does not mandate that prison officials always follow an inmate's expressed preference for a cellmate in a double cell.  See (id. ("Double-celling of inmates generally shall be based on the inmate's expression of preferences affecting double-celling compatibility.  An inmate's request generally shall be accommodated if circumstances permit and provided that there are no contraindications (custody level, security needs, etc.) noted by staff." (quoting Reception and Classification Procedures Manual, § 5.B.2.b.))).  In addition, while not determinative, the Court notes that inmates do not have a constitutional right to choose a cellmate.  See Murray v. Bledsoe, 650 F.3d 246, 247 (3d Cir. 2011).  Overall, Mickens's allegations against Clark fail to show that his cell transfer was an adverse action.  See, e.g., Victor v. Huber, No. 12-cv-00282, 2012 WL 2564892,

31

at *7 (M.D. Pa. Feb. 28, 2012) ("Inmates . . . frequently invite courts to infer retaliatory motives to cell assignments and other prison policies. Yet, these invitations, while frequently made, are rarely embraced by the courts.") . . . .

See (Doc. No. 18 at 37–40 (internal footnotes omitted)).

In his amended complaint, Mickens goes to great lengths to correct the issues with his original complaint that the Court identified in the March 31, 2025 Memorandum, particularly as to whether he suffered more than a de minimis adverse action from Clark's alleged retaliation. Mickens's factual allegations in support of his assertion that he suffered an adverse action include, inter alia, the following:

- Prior to Clark moving Mickens's cell from the CB Unit to the "less desirable cell/location" on the CA Unit, he had a VCA with his then-cellmate on the CB Unit, see (Doc. No. 20 at 8).

- Clark did not move Mickens's cellmate with him to the CA Unit, see (id.).

- Upon his transfer to the CA Unit, Mickens entered into a VCA with another inmate, which "was preapproved by the CA Unit Sergeant," see (id.).

- Clark "ignored and/or effectively denied the preapproved VCA by placing another inmate" in Mickens's cell, see (id.).

- An approximately sixty-year-old sex offender, who had been convicted of rape, "was initially placed" into the CA Unit cell with Mickens, see (id. at 16).

- Mickens's initial cellmate "suffered from a medical condition that caused him to frequently urinate on himself and, at times, defecate on himself," which caused the cell to "reak[] of urine," see (id.).

- Mickens's new cell "was extremely dirty," see (id.).

- Mickens previously indicated a preference to not be placed in a cell with a sex offender, see (id.), yet Clark did not interview him or consult with him about his preference on the move, see (id. at 17).

- Prison records would show that there were additional beds available at the time of Mickens's move, see (id.).

32

- Mickens's new cell was missing glass panes on the window, for which he managed to submit a work order, see (id. at 18, 19), and were fixed by inserting plexiglass panes, see (id. at 18).

- The toilet in Mickens's cell leaked water onto the floor and it was not completely repaired despite the maintenance department performing work on the toilet after he complained about it and submitted a work order.  See (id. at 19).

- Mickens discovered in September 2023 that his new cell had preexisting heating issues due to malfunctioning valves in SCI Rockview's steam heating system, which caused his cell to lack heat, see (id.).

- The "same [correctional officers] who are part of [the] CB Unit Management Team" "still partially over[saw]" the CA Unit, see (id. at 14).

- General population inmates view the CB Unit as the "unofficial 'honor unit'" at SCI Rockview, insofar as the inmates have a low risk of violence towards staff members and other inmates, see (id. at 15), even though inmates at the same Custody Levels—Levels 2, 3, and 4, are confined in it and the CA Unit, see (id.).

- Inmates housed in the CA Unit include inmates with a violent history towards staff and other inmates, see (id.).

- CB Unit includes, inter alia, (1) a less-secured "bubble" for the correctional officers' offices; (2) Clark's office; (3) a lack of a direct line of sight to "dogleg rear section of the unit"; (4) a "copier/printer where staff print . . . count sheets for both CA and CB [U]nits"; (5) a storage area for all block supplies such as cleaning chemicals; and (6) unlocked cell doors "during normal operations with the exception of count time and evening locks at [8:50 p.m.]," see (id.).

- CA Unit includes, inter alia, (1) a more-secured, centrally positioned bubble in which they have "a full 360 line-of-sight view of all the ranges; (2) no printer/copier; and (3) "only block supplies that will be distributed immediately," see (id. at 15–16).

These alleged conditions in Mickens's new cell in CA Unit are insufficient to constitute adverse action for purposes of a First Amendment retaliation claim because they were not so severe to deter a person of ordinary firmness from exercising their constitutional rights. Assuming, arguendo, that the characteristics of an inmate's cellmate constitute a condition of confinement, Mickens's inability to be placed in a cell with the cellmate of his choice generally does not amount to an adverse action.  See LaFountain v. Harry, 716 F.3d 944, 949 (6th Cir.

33

2013) ("Cell assignments are a normal part of prison life, and thus typically do not amount to an adverse action."); see also Murray, 650 F.3d at 247 (explaining that inmates do not have a constitutional right to their choice of a cellmate).

Additionally, even if Clark assigned a sixty-year-old sex offender to Mickens's cell as he alleges, that action is not sufficiently adverse for at least three reasons. First, Mickens alleges that he was only "initially placed" into his new cell with this other inmate, see (Doc. No. 20 at 16), and he alleges no facts as how long he was in the cell with this other inmate. Second, Mickens does not allege that this cellmate posed an excessive risk (or any risk) to Mickens's health and safety, or that Clark knew that the cellmate posed such a risk to him. See Chruby, 2018 WL 4537404, at *12 (concluding that assigning a new cellmate posing a particular risk to the plaintiff constituted adverse action); see also Buckley v. MDOC, No. 25-cv-00470, 2025 WL 3962186, at *4 (W.D. Mich. Dec. 10, 2025) (indicating that "'extraordinary circumstances' might transform a cell assignment into adverse action, such as where the plaintiff's cellmate is mentally ill or otherwise presents a danger to the plaintiff" (quoting LaFountain, 716 F.3d at 949)), report and recommendation adopted sub nom. Buckley v. Finney, No. 25-cv-00470, 2026 WL 78211 (W.D. Mich. Jan. 9, 2026); Mayo v. Rogers, No. 20-cv-00185, 2022 WL 22684511, at *3 n.1 (W.D. Pa. Mar. 7, 2022) ("[W]ithout knowledge that [the plaintiff's new cellmater] posed an excessive risk, [the] assignment of him as a cellmate to [the plaintiff] does not constitute the adverse action necessary to state a retaliation claim.").[4] Third, to the extent that Mickens's initial

---

[4] Mickens's attempt to use the cellmate's conviction as a circumstance in support of an adverse action is unavailing because Mickens alleges that he is incarcerated pursuant to a life sentence. See (Doc. No. 20 at 17 (alleging that he is a "life-sentenced inmate")). The Court takes judicial notice that Mickens is serving a life sentence after a jury in the Court of Common Pleas of Philadelphia County found him guilty of, inter alia, first-degree murder. See Commonwealth v. Mickens, No. 2719 EDA 2017, 2019 WL 3779757, at *1 (Pa. Super. Ct. Aug. 12, 2019) (identifying conviction and sentence). As such, although Mickens might have preferred not to

cellmate had a medical condition which caused him to "frequently urinate on himself and, at times, defecate on himself," see (Doc. No. 20 at 16), Mickens does not allege that Clark knew about this inmate's medical condition or that it existed prior to the inmate being placed into Mickens's new cell. And, again, it is unclear from the amended complaint how long this other inmate remained in Mickens's cell, if Mickens's complained to staff about the inmate's medical issues or the smell in his cell, or if any steps were taken to alleviate any smells caused by the inmate's medical issues. See Griffin, 2018 WL 5437743, at *3 ("Temporary inconveniences . . . do not meet [the adverse action] standard . . . .").

As for Mickens's allegations about the other conditions in his new cell, those are also insufficient to show he suffered an adverse action. Although he generally complains that his new cell was "dirty," see (Doc. No. 20 at 16), he does not describe how it was dirty, that he or staff were unable to clean it (or even who had the responsibility for cleaning it), that he complained about the cell being dirty, or that this condition somehow posed a risk to him. Regarding the broken window and leaky toilet, Mickens points out that after submitting work orders, the maintenance staff fixed the broken window and attempted to fix the leaky toilet, even if maintenance was unable to fully resolve the toilet leak insofar as it "still seep[ed] water onto the floor from the seal." See (id. at 19). Mickens does not describe how much water "seep[ed]" onto the floor following maintenance's attempted repair, and he does not allege that he filed a new work order for a repair. As such, the alleged leak is insufficiently adverse for a First Amendment retaliation claim because it does not rise to the level of an action "sufficient to deter a person of ordinary firmness from exercising [their] rights." See Allah, 229 F.3d at 225; see

---

have a convicted sex offender as a cellmate, this is not a case where, for instance, an inmate convicted of a nonviolent offense was placed into a cell with an inmate convicted of a violent offense.

35

also Owens, 629 F. App'x at 167 ("[The plaintiff's] mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower does not meet these [First Amendment retaliation] elements.").

Concerning Mickens's allegations about the heating system in his new cell, insofar as it allegedly did "not come on at all," as he noticed in late-September 2023, see (Doc. No. 20 at 19), he does not allege how he was affected by any lack of heat, how long his cell lacked heat, and whether he complained about a lack of heat.[5]  More importantly, Mickens does not allege facts about how the heating system in his new cell compared with that in his former cell, especially considering he appears to complain that the valves for SCI Rockview's steam heat system "commonly malfunction[ed,] causing the steam heat to either stay on constantly or not come on at all."  See (id.).  Thus, Mickens describes a situation where even his former cell would have had too much heat or not enough heat.  See (id.).

The remaining characteristics of Mickens's new cell described in his amended complaint relate to the alleged continued presence of the CB Unit correctional officers in the CA Unit, the general population inmates' perception of CB Unit, the structural differences between CA Unit and CB Unit, and the inmate population in each Unit.  See (id. at 13–16).  None of these allegations, either alone or in conjunction, rise to the level of an adverse action.

Beginning with the continued presence of the CB Unit correctional officers in the CA Unit, this condition is not sufficiently adverse because there was no change from the situation Mickens faced while in his former cell.  In addition, Mickens provides inconsistent allegations about how often the CB Unit officers he complained about to PPS, or in his two grievances, were

---

[5]  It appears that Mickens did not complain about the heat in his cell.  See (id. ("While it is true that Mickens did not grieve/complain about the cell issues on CA except that [he] requested a Work Order to be placed to fix [the] toilet and window . . . .")).

36

in the CA Unit.  Compare (id. at 14 (alleging that the CA Unit was "still partially overseen by the same [correctional officers] who are part of [the] CB Unit Management Team[, which] . . . placed Mickens in direct contact with the same [correctional officers] on CA Unit as on CB Unit"), with (id. at 13 (alleging that he "would have occasion to come into direct contact with at least one of [the two CB Unit correctional officers] on a daily basis, at least every 15 minutes").

Regarding the structural differences between CB Unit and CA Unit, Mickens's allegations amount to CA Unit being slightly more secured than CB Unit, the bubble in CA Unit providing a more expansive view of the Unit than the bubble in CA Unit, CB Unit staff having access to a printer/copier, and CB Unit storing "all block supplies."  See (id. at 15–16).  None of these differences are significant enough to show that he suffered an adverse action when Clark allegedly relocated him to CA Unit.  As for the inmate population, both Units house Custody Level 2, 3, and 4 inmates, meaning that both units house non-violent as well as violent inmates. See (id.).  Moreover, regardless of whether certain inmates consider CB Unit as the "unofficial 'honor unit'" at SCI Rockview, Mickens simply does not describe conditions present in CA Unit which are sufficiently different to deter a person of ordinary firmness from exercising their constitutional rights.  Accordingly, the Court concludes that Mickens's allegations in support of his First Amendment retaliation claim would not result in a favorable decision at trial because he cannot satisfy the requirement that he show he suffered an adverse action from Clark's alleged retaliation.  See, e.g., Victor, 2012 WL 2564892, at *7 ("Inmates . . . frequently invite courts to infer retaliatory motives to cell assignments and other prison policies.  Yet, these invitations, while frequently made, are rarely embraced by the courts.").

Additionally, assuming, arguendo, that Mickens's allegations were somehow sufficient to show that he suffered an adverse action by Clark allegedly relocating him to a cell on CA Unit,

37

his retaliation claim fails in at least two other respects.  First, and as the Court noted when resolving Defendants' motion to dismiss Mickens's original complaint, he still fails to allege any facts showing how Clark was aware of his complaint to PPS about the alleged inaction by the correctional officers when confronted with the inmate in physical distress in April 2023.  To show that the alleged retaliatory act was caused by protected conduct, "the actor 'responsible for the alleged adverse actions' must have been aware of the conduct in question."  See Smallwood-Jones, 2023 WL 1102333, at *4 (quoting Andreoli, 482 F.3d at 650); see also Hammond, 628 F. App'x at 808 (explaining that "we have generally required that defendants in First Amendment retaliation actions be aware of the protected conduct in order to establish the requisite causal connection," and concluding that "we are not required to credit [the plaintiff's] bald assertion" that defendants "were aware of [his] protected activities" (citing Ambrose, 303 F.3d at 493)).  Moreover, although Clark ultimately denied Grievance No. 1044716 relating to the alleged incident on July 24, 2023, she did so almost a week after she allegedly moved Mickens to CA Unit, and Mickens does not allege that Clark was aware of this grievance prior to the date she denied it, even if she was allegedly aware of the conduct giving rise to the grievance.

Second, Mickens fails to allege sufficient facts that would create a reasonable inference that Clark retaliated against him based on his complaints about her subordinates but not about her.  "Courts have consistently rejected retaliation claims 'against one defendant based on [protected activity] against another [individual]' for lack of retaliatory motive."  See Muhammad, 2024 WL 3540991, at *3 (citations omitted); see also Royster, 308 F. App'x at 579 (affirming summary judgment in favor of defendant on plaintiff's claim that he was retaliated against by a defendant who was not the target of his protected activity).  It remains unclear from Mickens's allegations in his amended complaint as to why Clark, who had only reviewed and rejected two

38

(2) of Mickens's grievances over a more-than-two-month period and was not the subject of any grievance herself, would retaliate against him for filing grievances against two of her allegedly subordinate officers.

Overall, Mickens has not shown that he has a meritorious First Amendment retaliation claim against Clark. Therefore, the sixth Poulis factor weighs in favor of dismissal.

### G.    Balancing the Factors

When balancing the Poulis factors, there is no "magic formula" or mathematical calculation used to direct a particular result. See Briscoe, 538 F.3d at 263. Also, as stated above, "no single Poulis factor is dispositive," and that "not all of the Poulis factors need be satisfied in order to dismiss a complaint." See Ware, 322 F.3d at 222; Mindek, 964 F.2d at 1373. In balancing the factors here, the Court is mindful that dismissal "is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits." See Liggon-Reading v. Est. of Sugarman, 659 F.3d 258, 260 n.1 (3d Cir. 2011) (citations omitted).

In this case, the first, third, fourth, fifth, and sixth factors weigh in favor of dismissal. The only factor weighing against dismissal is the second factor. Upon balancing these factors, the Court finds that dismissing Mickens's amended complaint with prejudice is warranted and appropriate in this case.[6]

---

[6] Even if the Court addressed the merits of Clark's Rule 12(b)(6) motion to dismiss, the Court would still determine that Mickens fails to plead a plausible First Amendment retaliation claim against Clark for the reasons identified in the Court's analysis of the merits of this claim. Moreover, as Mickens had already had one opportunity to amend his complaint to allege a plausible claim for relief against Clark, the Court would not provide him with leave to file a second amended complaint because doing so would be futile.

## IV.    CONCLUSION

For the reasons stated above, the Court will dismiss Mickens's amended complaint with prejudice, deny Clark's Rule 12(b)(6) motion to dismiss as moot, and direct the Clerk of Court to close this case.  An appropriate Order follows.


<u>s/ Yvette Kane</u>
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania